# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KURAMO CAPITAL MANAGEMENT, LLC, KURAMO AFRICA OPPORTUNITY MASTER FUND II, L.P., KURAMO AFRICA OPPORTUNITY MASTER CO-INVESTMENT VEHICLE III, LP, and KURAMO AFRICA OPPORTUNITY AGRIBUSINESS VEHICLE, LP, <br><br> Plaintiffs, Counterclaim Defendants, <br><br> v. <br><br> LARRY SERUMA, NILE CAPITAL MANAGEMENT, LLC, NILE GLOBAL FRONTIER FUND, LLC, and KN AGRI, LLC, Feronia KNM SRL, <br><br> Defendants, Counter-Plaintiffs, Third-Party Plaintiffs, <br><br> v. <br><br> KURAMO OPPORTUNITY OFFSHORE FUND II GP, LTD., <br><br> Third-Party Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2021-0323-KSJM |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: October 6, 2023
Date Decided: April 30, 2024

Bruce E. Jameson, J. Clayton Athey, John G. Day, Christine N. Chappelear, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Mary S. Thomas, THOMAS LAW LLC, Wilmington, Delaware; Steven R. Popofsky, Robert M. Tuchman, KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, New York; *Counsel for Plaintiffs and Counterclaim Defendants Kuramo Capital Management,*

*LLC, Kuramo Africa Opportunity Master Fund II, L.P., Kuramo Africa Opportunity Master Coinvestment Vehicle III, LP, Kuramo Africa Opportunity Agribusiness Vehicle, LP & Third-Party Defendant Kuramo Opportunity Offshore Fund II GP, Ltd.*

Eric A. Veres, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Andrew K. Glenn, Trevor J. Welch, Marissa E. Miller, George L. Santiago, Fiona M. Carmody, GLENN AGRE BERGMAN & FUENTES LLP, New York, New York; *Counsel for Defendants, Counterclaim Plaintiffs, and Third-Party Plaintiffs Larry Seruma, Nile Capital Management, LLC, Nile Global Frontier Fund LLC, KN Agri LLC & Counter-Plaintiff/Third-Party Plaintiff Feronia KNM SRL.*

**McCORMICK, C.**

At the heart of this case is Plantations et Huileries de Congo SA ("PHC"), a Congolese palm oil production business headquartered in Kinshasa, the capital of the Democratic Republic of the Congo (the "DRC"). The DRC owns approximately 24% of the shares of PHC. The parties in this litigation collectively controlled the remaining 76%, but they had a serious falling out. They now dispute their relative beneficial interests in the PHC shares. The plaintiffs claim that the individual defendant schemed to cheat them out of a majority stake in the PHC shares. They assert claims for breach of fiduciary duties and governing contracts. The defendants counterclaimed for breach of contract, among other things. It was an everything-but-the-kitchen-sink sort of litigation, which made factual and legal analysis challenging, as this overly long decision no doubt reflects. Long story made short: The plaintiffs prevail on some of their claims. The defendants prevail on none. And there are a few loose ends that the parties have leave to address through supplemental briefing.

## I.    FACTUAL BACKGROUND

As reflected in the Schedule of Evidence submitted by the parties, the record comprises 2,013 joint trial exhibits, trial testimony from four fact witnesses and one expert witness, deposition testimony from fourteen fact witnesses and one expert witness, and 21 stipulations of fact set forth in the amended pre-trial order.[1] These are the facts as the court finds them after trial.

---

[1] C.A. No. 2021-0323-KSJM, Docket ("Dkt.") 298, Joint Schedule of Evid. This decision also cites to: trial exhibits (by "JX" number); the plaintiffs' demonstrative exhibits (by "PX" number), Dtk. 272; the defendants' demonstrative exhibits (by "DX" number), Dkt. 271; the trial transcript, Dkts. 274–78 (by "Trial Tr. at" page, line, and witness); the Amended Pre-Trial Stipulation and Order ("Am. PTO"), Dkt. 265; the transcript

## A. The Beginning

Plaintiff Kuramo Capital Management, LLC manages a group of private-equity funds, which this decision refers to collectively as "Kuramo," that target investments in Sub-Saharan African businesses.[2]  Kuramo had four members: Founder and CEO Wale Adeosun; Chief Investment Officer Shaka Kariuki; COO Kamal Pallan; and an unnamed "institutional family office."[3]  Kuramo first invested in PHC in 2017.

### 1. Feronia And PHC

PHC is a Congolese palm oil production business headquartered in Kinshasa with operations at three large, remote estates along the Congo River.[4]  PHC employs

---

of the post-trial oral argument, Dkt. 301 (by "Post-Trial Oral Arg. Tr. at" page, line, and witness); and the transcripts of the depositions of Mpoko Bokanga, Monique Gieskes, Kamal Pallan, Larry Seruma, Mojisola Fashola, Changlong (Sammy) Hung, Haley Yu, Chris Harris, Tapiwa Mhizha, Shaka Kariuki, Elizabeth Seruma, Wale Adeosun, Marti Murray, Amanda Muganwa, Edmond Lamek (by the deponent's last name and "Dep. Tr. at" page and line).

[2] Kuramo clients invest for both financial returns and to generate "social and environmental benefits."  *See* Trial Tr. at 6:12–7:2 (Pallan) (describing Kuramo Capital Management, LLC).  These entities constitute Kuramo: Kuramo Capital Management, LLC, Kuramo Africa Opportunity Master Fund II, L.P. ("Kuramo Master Fund"), Kuramo Africa Opportunity Master Co-Investment Vehicle III, LP ("Kuramo CIV III"), and Kuramo Africa Opportunity Agribusiness Vehicle, LP, and Third-Party Defendant Kuramo Opportunity Offshore Fund II GP, LTD ("Kuramo Fund II GP").  *See* Am. PTO ¶¶ 24–30; Dkt. 291 ("Nile Post-Trial Opening Br.") at 1 n.1.

[3] Trial Tr. at 8:6–15 (Pallan); *see also id.* at 10:10–12 (Pallan) (stating Kuramo is registered with the SEC).

[4] *Id.* at 23:13–24:12 (Pallan); JX-6 at 1–9 (describing business and operations).

2

thousands of full-time employees and provides them and their families with housing, healthcare, and education.[5]

The DRC has, at all relevant times, owned 23.84% of PHC.[6] In 2009, Unilever owned the other 76.16%.[7] That year, Unilever sold its interests in PHC to Feronia Inc., a Canadian holding company with no other assets or operations.[8] The transaction made Feronia the sole owner of PHC's shares not held by the DRC and thus the sole vehicle for investing into PHC.[9] For simplicity, this decision refers to the 76.16% interest acquired by Feronia as the "PHC Shares."

Shortly after acquiring the PHC Shares, Feronia raised capital through debt and equity transactions with a small group of development finance institutions ("DFIs"). One of the DFIs was an affiliate of the British government called CDC Group PLC.[10] By early 2017, CDC had acquired a majority of Feronia's stock.[11]

---

[5] Trial Tr. at 23:23–24:12 (Pallan). The court's summary of the facts eschews a deeper dive into PHC's history, which dates back to the early 1900s and is marred by the disturbing saga of Belgian colonialism in the DRC.

[6] Am. PTO ¶ 38; Trial Tr. at 24:20–25:8 (Pallan).

[7] *See* Am. PTO ¶ 39.

[8] Am. PTO ¶ 39. Feronia held a portion of its interests in PHC through a Belgium-domiciled entity, Feronia Maia SPRL, of which it was 99.9999% owner. Dkt. 17 ("Nile's Answer to Kuramo's Am. Compl.") at 13. For simplicity, and because Feronia Maia SPRL is not independently relevant to the dispute, counsel's briefing elides Feronia Maia SPRL's existence. The court follows counsel's lead.

[9] *See* Am. PTO ¶¶ 38–39.

[10] *Id.* ¶ 40.

[11] *Id.*; *see* Trial Tr. at 28:21–31:1 (Pallan).

3

Other DFIs from Germany, Belgium, and the Netherlands (the "DFI Lenders") invested in Feronia through senior secured debt.[12]   In December 2015, the DFI Lenders entered into a "Term Facility Agreement" with PHC providing for loans of up to $49,000,000.[13]  Over the next two years, the DFI Lenders funded $43,000,000.[14] In connection with the Term Facility Agreement, Feronia agreed to fully guaranty PHC's repayment obligations to the DFI Lenders, pledging all its PHC Shares as collateral.[15]

### 2.       Kuramo And Mafuta Invest In Feronia.

Kuramo was first approached by Congolese businessman Kalaa Mpinga, a majority owner of Mafuta Limited, to invest in PHC.[16]   In 2016, Mafuta was negotiating an acquisition of Feronia shares from CDC and looking for financial backing.[17] The opportunity piqued Adeosun's interest, and Kuramo decided to invest in Feronia with Mafuta.[18]

To hold their respective interests and define each party's governance rights, Kuramo and Mafuta formed a pair of special purpose vehicles domiciled in

---

[12] Trial Tr. at 36:9–37:2 (Pallan); JX-2 (term facility agreement).

[13] JX-2 at 31–33.

[14] Trial Tr. at 36:21–37:2 (Pallan); *see* JX-20 at 1–2.

[15] Am. PTO ¶ 45.

[16] Trial Tr. at 25:18–24, 32:11–14 (Pallan).   At trial, Larry Seruma claimed to have sourced the PHC investment opportunity, but there was no support for that in the record. *Id.* at 770:13–773:13 (Seruma).

[17] *Id.* at 25:18–24, 27:12–28:8, 32:15–33:1 (Pallan); *see* JX-13 at 1–2.

[18] Trial Tr. at 548:19–549:19 (Adeosun).

Mauritius—Straight KKM Limited ("KKM"), and its wholly owned subsidiary, Straight KKM 2 Limited (together, the "Straight KKM Vehicles").[19] The plan was to have Kuramo and Mafuta invest through Straight KKM Limited, which would hold 100% of the interests in Straight KKM 2 Limited, which would own equity in Feronia.[20]

On September 14, 2017, Kuramo, Mafuta, and CDC executed a "Commitment Deed"—an expression of "the Parties' commitment to executing definitive documentation" for an investment in Feronia.[21] Kuramo committed to purchase Feronia stock from CDC and through new issuances.[22] Kuramo also committed to provide Feronia with an unsecured credit facility of $4 million as a bridge loan through January 31, 2018.[23]

### 3. Kuramo Reconnects With Nile.

Meanwhile, in early 2017, Adeosun reacquainted with an old connection—Defendant Larry Seruma, the Chief Investment Officer and sole managing member of Defendant Nile Capital Management, LLC ("Nile Capital").[24] Adeosun had known Seruma for years through the relatively tight-knit community of U.S. investors who

---

[19] JX-46; JX-47.

[20] JX-20 at 1–2; Trial Tr. at 32:3–8 (Pallan) ("[W]e created a new vehicle that would serve as the special purpose vehicle for the Kuramo investments and Mr. Mpinga's investment."); *see* Am. PTO ¶ 3.

[21] JX-27 at 1 (commitment deed).

[22] Trial Tr. at 31:14–32:2 (Pallan); JX-27 §§ 1–6.

[23] JX-27 §§ 5.1, 5.2.

[24] Am. PTO ¶ 31; Trial Tr. at 11:23–12:3 (Pallan). Nile was a registered investment adviser until March 29, 2019. Am. PTO ¶ 34.

5

focus on African businesses.[25]   Seruma testified that he had managed over $2,000,000,000.[26]   By 2017, however, Seruma had closed all but two of the Nile Capital-managed funds:  Defendant Nile Global Frontier Fund ("NGFF" or "Nile Global"), which held less than $2,000,000 in assets,[27] and a non-party mutual fund that went on to close in 2019.[28]

In April 2017, Kuramo committed to allocate at least $25,000,000 to Nile Capital investments.[29]   Seruma agreed to manage Kuramo's allocated funds as its fiduciary.[30]   The parties memorialized their agreement by amending the Nile Capital LLC agreement (the "Amended Nile LLC Agreement").[31]   The company changed its name from Nile Capital Management, LLC to Kuramo Nile Capital Management, LLC ("Kuramo-Nile").[32]   Seruma continued to use the trade name "Nile Capital Management, LLC" or "Nile."[33]

---

[25] Trial Tr. at 11:12–22 (Pallan) (describing how Adeosun had known Seruma since at least 2012 or 2013 because "the universe of investment managers who focus on Africa is relatively small").

[26] *Id.* at 725:16–726:13 (Seruma).

[27] JX-144 at 135–47 (12/31/16 NGFF financial statement); Trial Tr. at 20:16–21:23 (Pallan).

[28] JX-140 at 1.

[29] JX-7 ("Am. Nile LLC Agr.") art. 7.

[30] *Id.*, art. 5; *see* Trial Tr. at 1204:2–12 (Seruma).

[31] Am. Nile LLC Agr. at 2.

[32] *Id.*

[33] References to Nile Capital or Nile throughout this decision refer to the Seruma-controlled entity.

Under the Amended Nile LLC Agreement, Kuramo became a member of Kuramo-Nile and received 49,000 membership interest units.[34]

Prior to entering into the Amended Nile LLC Agreement, Kuramo performed diligence on Seruma.[35] Kuramo became comfortable entrusting Seruma with millions of dollars in Kuramo clients' money,[36] but Kuramo understood that the relationship might not work out as intended.[37] For that reason, Pallan negotiated a term that gave Kuramo the right to withdraw its beneficially-owned assets on demand, before the end of the otherwise-applicable five-year lock-up period, for any reason or for no reason at all.[38]

As Pallan explained:

> Going back to our obligation to our limited partners . . ., we said, look, if at any point in time this relationship doesn't work out for any reason, whether we don't like the investments you're making or things don't work out for whatever reason, we want the ability to recall our money. And, again, when I say "our money," it's really money that was entrusted to us that we've entrusted to Mr. Seruma. That's all we wanted. If things don't work out, give us back our assets, and we will relinquish the 49 percent interest that we have in [Nile Capital]. So that was an explicit and stated agreement.[39]

---

[34] Am. Nile LLC Agr. § 7.2. The Amended Nile LLC Agreement confusingly states that it (Nile) held the remaining 51,000 and that those units entitled Seruma to economic distributions. *See* Am. Nile LLC Agr. Ex. B. This fact is of little consequence to the parties' dispute, so the decision moves on.

[35] Trial Tr. at 12:4–14:8 (Pallan); JX-10 at 26–27.

[36] Trial Tr. at 13:17–14:8, 22:12–23:10 (Pallan).

[37] *See* Trial Tr. at 18:12–19:21 (Pallan).

[38] Trial Tr. at 18:12–20:11 (Pallan); Am. Nile LLC Agr. § 15.6.

[39] Trial Tr. at 19:9–21 (Pallan).

This term is found in Section 15.6 of the Amended Nile LLC Agreement, titled "Resignation/Termination by Kuramo Before the Lock Up Period" and provided that: "In the event that Kuramo serves notice to . . . redeem its assets before the lock up period," then Kuramo would incur certain enumerated penalties.[40]

In 2017 and early 2018, Kuramo invested $25 million in NGFF. Specifically, Kuramo entered into a subscription agreement to acquire interests in NGFF Series P (the "Series P Subscription"). Kuramo executed the initial subscription agreement on June 30, 2017, and provided NGFF with $15 million.[41] Kuramo executed three additional subscription agreements, providing NGFF with the additional $10 million in capital.[42] These investments made Kuramo NGFF's 95.2% beneficial owner.[43] Of the remaining 4.8%, Seruma personally owned 1% based on a $250,000 cash

---

[40] Am. Nile LLC Agr. § 15.6 (listing penalties as: "(a) Kuramo shall relinquish its Membership and ownership interests and share of undistributed Profits of the Company, (b) Any distributions of income or other assets that would have been paid to Kuramo will be used by the Company to offset termination costs, (c) Kuramo will be subject to the following surviving clauses from the agreement: Section 13.7, 13.8, 16.1, 16.3, 16.4, 16.5, 16.6, 16.7, and 16.8, (d) Kuramo will be liable for its Member liabilities that may arise after the termination date but which were incurred during the period of Kuramo's Membership, in all cases subject to a maximum of the aggregate amount of distributions paid to Kuramo, and (e) Kuramo shall fulfill all legal and regulatory requirements as a consequence of such resignation."); *see* Trial Tr. at 19:22–20:3 (Pallan).

[41] JX-1821 at 1, 32.

[42] JX-32 ($3,000,000); JX-45 ($5,000,000); JX-72 ($2,000,000).

[43] Trial Tr. at 21:24–22:11; *see* JX-176 at 7 (stating Kuramo's ownership in Nile as of December 31, 2018 is 95.2%). Kuramo made these investments through subscription agreements. JX-1821 ($15,000,000); JX-32 ($3,000,000); JX-45 ($5,000,000), JX-72 ($2,000,000).

8

contribution he made in 2014—a proportional interest typical for the industry.[44]  And an outside investor, the Segal Foundation ("Segal"), purportedly owned the rest.[45]

In addition to Series P, at the time Kuramo acquired interests in NGFF, NGFF also had a Founders Series and Series A.[46]  Seruma's $250,000 cash contribution into NGFF was made through the Founders Series.[47]

Through the Series P Subscription, Kuramo became bound to the terms of the underlying NGFF LLC agreement (the "NGFF LLC Agreement").[48]  The Series P Subscription included a five-year lock-up period.[49]  Under the NGFF LLC Agreement, that lock-up period restriction could be waived by the managing member of NGFF, who was Seruma.[50]

---

[44] JX-1188 at 5; Trial Tr. at 7:11–21, 22:5–11 (Pallan).

[45] *See* Trial Tr. at 883:9–884:1, 1203:18–1204:1 (Seruma).

[46] JX-1448 at 192 (NGFF LLC Agreement); JX-1821 at 15.

[47] JX-1188 at 5.

[48] JX-1821 ¶ 2 ("Subscriber has carefully read, understands, and agrees to abide by, and be bound by, each of the terms and conditions set forth in the Memorandum, the [September 2013] LLC Agreement and this Application and Agreement."); JX-1448 at 189.

[49] *Id.* ¶ 21 ("Subscriber agrees that the Interests are subject to limited withdrawal rights, including that Interests may only be redeemed on June 30 or December 31 falling on or after the 60 months anniversary of the Members purchase of an Interest.").

[50] JX-1448 at 202 ("The Managing Member may, in its sole discretion, expressly waive or amend any of the restrictions, redemption schedule terms, lock-up periods, notice requirements, limitations or provisos regarding withdrawals contained in this Agreement, including, without limitation, permitting a Member to make a withdrawal for the purposes of making a federal, state or local income tax payment relating to the Member's Interest(s) in the Company.").

Seruma unilaterally amended the NGFF LLC Agreement on December 1, 2019 (the "Second Amended NGFF LLC Agreement") in two ways.[51] First, the Second Amended NGFF LLC Agreement allowed for in-kind capital contributions; the original NGFF LLC Agreement did not.[52] Second, the Second Amended NGFF LLC Agreement purportedly eliminated the managing member's ability to waive the lock-up period restriction.[53]

### 4. Kuramo Brings Nile Into The Feronia Investment.

After KKM executed the Commitment Deed, Kuramo asked Seruma to join KKM.[54] NGFF invested $7.5 million into KKM, and NGFF was integrated into the KKM structure through an amendment to the shareholders' agreement (the

---

[51] *Id.* at 227.

[52] *Compare id.* at 191 ("Each Member's Capital Contribution shall be in cash, provided that, in the discretion of the Managing Member, a Member's Capital Contribution may consist, in whole or in part, of marketable securities if deemed acceptable to the Managing Member and when securities are free and clear of all claims, liens charges and encumbrances."), *with id.* at 229 ("Each Member's Capital Contribution shall be in cash, or, if acceptable to the Managing Member, in kind.").

[53] *Id.* at 239–40 ("The Series P Interests shall up subject to a five (5) year lock-up period beginning as of the date of issuance of such Series P Interests ('**Series P Lock-Up Period**'). During the Series P Lock-Up Period, a Member may not withdraw any capital from the Company with respect to any Series P Interests held by such Member. After the Series P Lock-Up Period has lapsed, a Member may withdraw capital from the Company with respect to the Series P Interests in accordance with the terms of this Section 3. I 3 and the terms of such Member's Subscription Agreement." (bold in original)).

[54] *See* JX-40 at 1; JX-27 at 1; *see also* JX-47 ("Am. KKM Shareholders' Agr.") at 3; Trial Tr. at 39:8–14 (Pallan) (explaining Kuramo, Nile, and Mafuta "invested directly into an SPV called KKM").

"Amended KKM Shareholders' Agreement").[55] NGFF's $7.5 million investment came from Kuramo's capital contributions to NGFF.[56] In exchange for the $7.5 million, NGFF received a 43% interest in KKM. Kuramo invested an additional $10 million in KKM and received a 42% interest. Mafuta received the balance—a 15% "free carry" for sourcing the deal and in anticipation of future contributions.[57] At the end of the transaction, NGFF owned 43% of KKM, and Kuramo beneficially owned 95.2% of NGFF through its $25 million contribution.[58]

After NGFF joined in KKM's Feronia investment, Kuramo, Nile, and Mafuta referred to themselves as either "K-N-M" or the "Consortium."[59]

KKM had secured the right to place three individuals on the Feronia Board of Directors.[60] As part of the Amended KKM Shareholders' Agreement, Nile secured the right to nominate one of those three board members.[61] The Consortium appointed

---

[55] Trial Tr. at 37:23–40:14, 43:2–17 (Pallan); *see* Am. KKM Shareholders' Agr. at 3; JX-40 at 1; JX-55 at 3.

[56] Trial Tr. at 43:2–44:1 (Pallan).

[57] *Id.* at 43:8–44:23 (Pallan); JX-55 at 3; *see* JX-170 at 3.

[58] Trial Tr. at 21:24–22:11; *see* JX-170 at 3; JX-176 at 7.

[59] *See* Trial Tr. at 199:15–19 (explaining that KNM stood for Kuramo, Nile, and Mafuta); *id.* at 107:11–16 (referring to the consortium). The briefings inconsistently jump between "Nile" and "NGFF." Nile is the managing member of NGFF. Nile makes its investments through its fund, which is NGFF.

[60] JX-87 at 469 (1/24/28 Investor Rights Agreement between Feronia Inc. and Straight KKM 2 Limited).

[61] Am. KKM Shareholders' Agr. § 6.2.3 ("So long as KKM 2 is entitled to appoint: . . . (c) at least three KKM 2 Directors, one such director shall be nominated by NILE, one by MAFUTA and one by KURAMO.").

11

Adeosun (for Kuramo), Seruma (for NGFF), and Mpinga (for Mafuta).[62] Pallan later replaced Adeosun as Kuramo's representative.[63]

In addition to the Amended KKM Shareholders' Agreement, Pallan and Seruma, on behalf of Kuramo and NGFF, respectively, executed a "Side Letter Agreement" dated January 9, 2018.[64] The Side Letter Agreement provided that:

1) Kuramo and Nile shall agree unanimously on all voting matters relating to the business of KKM and KKM2

2) In cases, where such agreement is not reached, Nile's instructions shall take precedence and be binding on Kuramo

3) With respect to the investment note of $2 million to be effected between KKM and Nile, in the event of a default of the note, Kuramo shall approve the new issuance of additional KKM shares to Nile to satisfy the repayment of the agreement. The new shares to be issued would be 15,571,386 to Kuramo and 25,714,314 to Nile; for the avoidance of doubt, the final shareholding shall be 30.71% Kuramo and 54.29% Nile and 15% Mafuta in such a situation.[65]

Contemporaneous with the Side Letter Agreement, Seruma sent an email explaining its purpose—to ensure "that KKM is controlled by both Nile and Kuramo" and that would be accomplished by unanimity between Nile and Kuramo in relation to Mafuta.[66]

---

[62] Trial Tr. at 44:24–45:7 (Pallan).

[63] JX-185 at 1–2.

[64] JX-1610 ("Side Letter Agr.") at 1.

[65] *Id.*

[66] JX-53. For example, on September 20, 2018, Seruma emailed Pallan and Adeosun asking for Adeosun's consent on certain board actions because in Seruma's words:

At the end of January 2018, the ownership structure of PHC looked as follows:[67]



### 5. Kuramo Brings Nile Into The Feronia Investment.

In addition to the PHC deal, Seruma and Kuramo were working toward other joint ventures. Relevant here, on January 30, 2018, Kuramo agreed to guarantee NGFF's $28 million acquisition of an entity called "GenAfrica."[68]

---

"Kuramo Nile and Kuramo shall agree unanimously on all voting matters of Feronia per our side letter agreement. So, I need your decision on this, otherwise the Feronia board will not reach a decision." JX-101 (emphasis omitted).

[67] Dkt. 290 ("Kuramo Post-Trial Opening Br.") at 13.

[68] JX-62 at 9 (GenAfrica agreement); Trial Tr. at 957:17–19 (Seruma).

Originally, NGFF was purportedly going to manage the investment. In March 2019, however, Seruma claims that Kuramo told him he would not receive dividends unless he gave up management authority to Kuramo.[69] The record is unclear as to what transpired next; according to Seruma, the effect was that Seruma had to close one of his funds.[70]

Potentially shedding light on future events, Seruma told Pallan days before he was set to lead the restructuring transaction described below: "I don't want this to be another GenAfrica, where I am cast aside or have a discussion where Kuramo and Nile are not aligned."[71]

## B. The Restructuring Transaction

In mid-2018, Feronia management revealed that the company was nearly insolvent despite the significant investments from the Consortium and the DFIs.[72] This was surprising. As Seruma put it at the time, the "board is astonished at how [a] company can go from being overly funded to running out of cash."[73] This prompted a series of capital infusions and ultimately led to a restructuring.

---

[69] Trial Tr. at 961:23–962:1 (Seruma); *see* JX-939 at 1.

[70] Trial Tr. at 960:8–961:15, 965:19–22 (Seruma); JX-140 at 1.

[71] JX-518 at 1.

[72] Trial Tr. at 46:11–51:4 (Pallan); JX-85 at 1; *see* JX-99 at 1, 3.

[73] JX-85 at 1–2.

14

### 1. KN Agri, The Bridge Loan, And The Private Placement

The Consortium conferred over the crisis at Feronia,[74] and, by November 2018, they had resolved to provide a second tranche of investments on terms to be negotiated with CDC, conditioned on "significant changes to management, capital structure and business model."[75] In December 2018, they reached an agreement to fund Feronia through a short-term bridge loan (the "2018 Bridge Loan").[76] The Consortium pledged $1.5 million in January 2019,[77] and an additional $1 million in March 2019.[78]

After executing the 2018 Bridge Loan, the Consortium and CDC discussed long-term financing for Feronia.[79] Those discussions culminated in an agreement for the Consortium and CDC to recapitalize Feronia by acquiring additional Feronia

---

[74] Trial Tr. at 50:15–51:4 (Pallan); JX-96 at 1 (Seruma to Pallan: "Feronia will most likely to [sic] be in negative cash flow by end of this year and will need to raise equity soon or within 6-12 months. As KKM we need to discuss . . . ."); JX-99 at 1 (Seruma to Adeosun and Mpinga: "Bottom line, as investors in the business, we need to evaluate the options as KKM (Nile and Kuramo) . . . ."); JX-100 at 1 (Seruma to Mpinga: "I propose that we postpone our call with CDC for an IN PERSON discussion when in London next week. The[re] are a number of key decisions, and new issues to discuss, that . . . we need to discuss at the KKM level."); JX-103 at 1 (Seruma to Adeosun: "I would like to catch up on . . . Feronia. . . . I have a lot of information, for example, on Feronia Board Meeting[s] that need[] your attention.").

[75] JX-111 at 4 (Seruma: "This email outlines the KKM proposal for your review, comments or suggestions."); Trial Tr. at 51:5–55:24 (Pallan).

[76] Trial Tr. at 61:3–19 (Pallan); JX-121 at 4 (12/20/18 bridge loan facility agreement).

[77] Trial Tr. at 61:3–19 (Pallan); JX-121 at 8–10.

[78] Trial Tr. at 61:12–62:4 (Pallan); JX-143 at 7–10 (3/14/19 bridge loan facility agreement).

[79] Trial Tr. at 64:22–66:8 (Pallan); *see, e.g.,* JX-124 at 1–2, JX-131 at 1.

shares in a private placement (the "Private Placement").[80]  The Consortium and CDC each agreed to pay $9,155,753 for the shares.[81]  For the Consortium, a portion of that sum was satisfied through forgiveness of the 2018 Bridge Loan, leaving a balance of about $6,500,000.[82]

To effectuate the Bridge Loan and Private Placement, Seruma formed KN Agri, LLC ("KN Agri") through an LLC agreement (the "KN Agri LLC Agreement").[83]  The KN Agri LLC Agreement was later purportedly amended (the "Amended KN Agri LLC Agreement").[84]  KN Agri was a single member-managed LLC, with NGFF as the member-manager.[85]  Of the $9,155,753 that KN Agri invested in Feronia, Kuramo contributed $8,895,890 directly or indirectly.  As a result, Kuramo became the 97.16% beneficial owner of KN Agri[86]—a fact that Seruma contemporaneously affirmed in

---

[80] Trial Tr. at 66:9–24 (Pallan); JX-169 ("May 31, 2019 Subscription Agr.").

[81] May 31, 2019 Subscription Agr. at 6–7.

[82] *Id.* at 7.

[83] *See* JX-120 ("KN Agri LLC Agr.") at 3; Trial Tr. at 60:8–61:11 (Pallan).

[84] JX-1274 ("Am. KN Agri LLC Agr.").  JX-1274 is a February 10, 2021 email chain between Seruma and Feronia, which attaches the "Amended and Restated Operating Agreement" of KN Agri LLC.  The agreement is signed by Seruma but it leaves blank the date.  JX-1274 at 6 ("Dated as of [November _____], 2019").  Kuramo did not challenge the validity of the amendment and the court follows suit.  *See* Kuramo Post-Trial Opening Br. at 116 n.605.

[85] KN Agri LLC Agr. ¶ 5.

[86] Trial Tr. at 78:7–22 (Pallan); JX-167 at 2.

writing.[87]    After the Private Placement closed, KN Agri was admitted to the Consortium as a shareholder.[88]

As of May 31, 2019, the ownership structure of PHC looked as follows:[89]



## 2.    Feronia's Woes Worsen.

The financial condition of Feronia continued to deteriorate.[90]    Shortly before the Private Placement closed, Feronia management reported positive EBITDA for the

---

[87] JX-167 at 2; JX-232 at 2–3.

[88] Trial Tr. at 70:18–71:14 (Pallan); JX-170 at 1, 8.

[89] PX-1.

[90] Trial Tr. at 80:23–81:8 (Pallan); JX-177 at 1, 4.

first time in Feronia's history.[91] Just weeks later, on July 22, 2019, Feronia Executive Chairperson Frank Braeken disclosed that the company was not EBITDA positive and was projected to lose tens of millions of dollars over the coming years.[92] Braeken gave his bottom line: "The company will need to urgently raise additional financing."[93]

It was clear to the Consortium members that changes had to be made, but the members disagreed on the nature of those changes.[94] At the time, CDC was signaling its intention to dilute the Consortium's interests if the group would not commit further capital.[95] Seruma disliked this idea and recommended walking away from the investment.[96]

Kuramo disagreed. After returning to the DRC and meeting with local management, Kuramo concluded that the PHC investment could be salvaged if the Consortium was "in the driver's seat of restructuring the company."[97]

As Pallan explained,

> up to that point in time we had always been co- or equal shareholders . . . with CDC. However, because CDC had . . . much longer . . . involvement with the business . . . , even though we really wanted to get involved and engaged with the day-to-day of the business, we weren't able to do that.

---

[91] Trial Tr. at 79:11–80:17 (Pallan); JX-151 at 1.

[92] JX-177 at 1, 4; *see also* JX-188 at 1, 3–10.

[93] JX-177 at 1.

[94] Trial Tr. at 83:1–91:22 (Pallan).

[95] *Id.* at 89:23–90:24 (Pallan); *see also* JX-245 at 1–2.

[96] Trial Tr. at 89:1–90:24 (Pallan); *see* JX-229 at 1–2.

[97] JX-196 at 6; Trial Tr. at 83:7–86:1 (Pallan).

18

So . . . we need to have ownership of the governance and the management of the company [to move forward].[98]

Adeosun described Kuramo's position as follows:

we felt that if we had control of . . . the PHC investment, we could make the changes we wanted. We could institute having local management in Kinshasa. . . . [I]f we had control, we could manage the business much better. . . . And we had the capacity to inject additional capital into the business.[99]

Seruma and Mafuta came around to Kuramo's view. On or about October 17, 2019, Adeosun met with CDC's CEO, Nick O'Donohoe.[100] The next day, Adeosun e-mailed O'Donohoe that Kuramo and the Consortium were prepared to inject additional capital if "fundamental changes" were made "going forward."[101]

Discussions continued throughout the remainder of 2019 and culminated at a February 2020 meeting in The Hague.[102] The meeting in The Hague was understood as important enough for Adeosun, Pallan, Seruma and Mpinga to all travel there in person.[103]

During the meeting, the DFI Lenders and CDC reached an agreement on a restructuring plan that gave the Consortium ownership of Feronia's stake in the PHC Shares. Pallan described the discussion as follows:

---

[98] Trial Tr. at 85:12–86:1 (Pallan).

[99] *Id.* at 555:17–556:4 (Adeosun).

[100] *See* JX-231 at 1.

[101] JX-235 at 1; Trial Tr. at 91:23–93:13 (Pallan).

[102] *See* Trial Tr. at 93:14–16, 97:7–99:1 (Pallan); JX-314 at 1–3.

[103] Trial Tr. at 98:14–99:2 (Pallan); *id.* at 554:24–555:2 (Adeosun); *id.* at 806:6–19 (Seruma).

19

So really this meeting, The Hague, was probably, I would say, the single most important meeting that we had had in the history of the investment to that point in time . . . . And it was a series of discussions around what did management know about the situation of the company, what were we going to do about it . . . .

And then the next day, it was a reconvening of the same parties. And at that point, now during the afternoon, Ms. Bianchi, who at the time was the senior representative of CDC, came out and said, look, CDC is willing to fund this business indefinitely going forward. . . . But in order for CDC to fund it, Ms. Bianchi said the lenders have to write off all their debt.

And Ulrich – I remember sitting there, and Ulrich was visibly upset. And he was, like, "No, no, no, no, no. Why would we write off the debt?"

And Ms. Bianchi said, "Well, the only way that CDC is going to put any more money into this company is if you, the lenders, write off the debt."

And Mr. Ulrich, you know, got up in his classic way and said, "No. What's going to happen is – how about a better proposal? How about you, CDC, give ownership of this company to Kuramo and the Kuramo Consortium for $1, and then we will write off the debt."

And we all looked around and, like, hmm, wow.

And that was how the meeting ended.[104]

Seruma, who was present for the meeting, claimed at trial not to remember any proposal by the DFI Lenders for CDC to "transfer or hand over its interest to KKM."[105] But in his contemporaneous e-mails, he specifically acknowledged the

---

[104] *Id.* at 99:2–100:17 (Pallan); *see also id.* at 556:5–13 (Adeosun).

[105] *Id.* at 983:8–985:6, 1017:8–1018:18 (Seruma).

"proposal to hand over to KKM as discussed in the meeting."[106] And Pallan's and Adeosun's testimony on this point was corroborated by multiple other contemporaneous e-mails.[107]

Kuramo understood that the DFI Lenders' proposal, though welcome, was not a "free lunch."[108] The DFI Lenders had concrete expectations around, among other things, ESG.[109] But within a few days of the meetings in The Hague, the DFI Lenders confirmed that their proposal was genuine.[110]

### 3. The Nine Steps

After months of negotiation, on May 20, 2020, Feronia, the Consortium, the DFI Lenders, and CDC entered into an agreement to restructure Feronia (the "Support Agreement").[111] The Support Agreement attached a "Restructuring Transaction Term Sheet" that laid out a nine-step restructuring transaction (the "Restructuring Transaction").[112] Adeosun negotiated the Support Agreement but entrusted Seruma with implementing it.[113] As Adeosun testified:

> I was involved in negotiating the [Support Agreement]. It was very tedious, very consuming. I was really tired, and I thought it made sense for me to pass [the baton] on to my

[106] JX-319 at 1.

[107] JX-315 at 1; JX-316 at 1; JX-318 at 1; JX-320 at 1.

[108] Trial Tr. at 103:17–19 (Pallan).

[109] JX-315 at 1; Trial Tr. at 103:4–21 (Pallan); *see* JX-396 at 1; JX-418; JX-551.

[110] JX-319 at 1; Trial Tr. at 104:13–106:23 (Pallan).

[111] JX-516 ("Support Agr.").

[112] *Id.* at 13–14 (listing the nine steps as part of the Restructuring Transaction "Term Sheet," which is Schedule A to the Support Agreement).

[113] Trial Tr. at 563:8–564:2 (Adeosun).

21

partner to lead the restructuring and [implementation of] the [S]upport [A]greement.[114]

On or about May 20, 2020, Seruma became Feronia's Executive Chair.[115] He immediately took the lead on implementing each of the nine Restructuring Transaction steps.[116]

In Step 1, the Consortium agreed to provide, or to cause an affiliate to provide, up to $15 million in additional bridge loans to Feronia (the "2020 Bridge Loan").[117] The Consortium provided these loans through two consecutive agreements. The first was a bridge loan facility agreement between KN Agri and Feronia Maia SRL dated May 20, 2020,[118] and the second was a bridge loan facility agreement between Kuramo and KN Agri dated May 22, 2020.[119] Seruma signed both agreements

---

[114] *Id.* at 563:5–17, 600:4–601:12 (Adeosun); *see also* JX-1325.

[115] JX-508 at 1–3, 25–26. The initial draft resolution stated that Seruma would not only be Executive Chair, but also CEO. JX-501 at 4. The Consortium had not agreed to Seruma serving as CEO, so Pallan instructed counsel and Seruma to make the necessary remedial changes, which they did. JX-502 at 1; JX-503 at 1; JX-504 at 1; *see* JX-507 at 1.

[116] Trial Tr. at 171:18–191:5 (Pallan).

[117] Support Agr. at 13 ("FM and the Sponsor (or an affiliate of the Sponsor) shall enter into a new bridge financing facility that shall provide for an initial draw in an aggregate total amount of US$5 million to be drawn on or before May 21, 2020 (the '**Initial Bridge Draw**') and, subject to the terms of the facility, subsequent draws as may be required by Feronia, FM and PHC up to US $10 million (the '**Subsequent Bridge Draws**') (the '**Bridge Financing**'). The terms of the Bridge Financing will be substantially in the form of Schedule 'B' hereto. The Bridge Financing documentation shall be in form and substance acceptable to the Sponsor, CDC and FM, each acting reasonably." (bold in original)); Trial Tr. at 133:15–18 (Pallan).

[118] JX-803 at 4 ("The Lender has agreed to provide the Borrower with an unsecured subordinated term loan facility in the maximum aggregate amount of $15,000,000.").

[119] JX-514 at 7 ("The Lender has agreed to provide the Borrower with an unsecured subordinated term loan facility in the maximum aggregate amount of $15,000,000.").

(together, the "2020 Bridge Loan Agreement").[120]  On May 20, 2020, Kuramo provided PHC with the first $5 million.[121]  Seruma made drawdown requests.[122]  Kuramo honored those requests.[123]

In Step 2, the Consortium agreed to form a "wholly owned special purpose affiliate" for the purpose of purchasing Feronia's PHC Shares.[124]  The Support Agreement defined that entity as the "Purchaser."  To consummate Step 2, Seruma formed "NewCo," which he then named Feronia KNM.[125]

In Steps 3 through 6, Feronia would engage an advisor to market its PHC Shares,[126] the Purchaser would make a stalking horse offer to acquire the PHC Shares and intercompany loans in the form of a 'Share & Asset Purchase Agreement,'

---

[120] JX-803 at 16; JX-514 at 28.  The back-to-back loan structure gave Seruma full control over the loan since Seruma could make draw requests through Feronia, and then call cash from Kuramo through KN Agri.

[121] JX-509 at 1–2.

[122] *See, e.g.*, JX-930 at 2 ($250,000 request in October 2020); JX-1024 at 2 ($4 million request in November 2020); JX-1158 at 2 ($250,000 request in December 2020).  The December 2020 drawdown notice attached the November 2020 drawdown notice, and Pallan corrected it accordingly.  *See* JX-1160 (email from Seruma to Pallan subject line "Oops" and stating the December 2020 drawdown notice "is corrected now" to $250,000).

[123] *See, e.g.*, JX-930 at 1; *see also* JX-923, JX-1006 at 1.

[124] Support Agr. at 12 (defining "Purchaser"); *id.* at 13 ("Purchaser is formed as a wholly-owned subsidiary of the Sponsor."); Trial Tr. at 133:19–21 (Pallan).

[125] Trial Tr. at 199:15–19 (Pallan); *see* JX-809 at 1.

[126] Support Agr. at 13–14 ("Each of Feronia, FM, PHC, the Sponsor, CDC, the Purchaser and the Senior Lenders (collectively, the '**Transaction Parties**') will, unless an Acceptable Transaction (as defined below) is identified and approved by the board of directors of Feronia on or prior to July 2, 2020, take all steps necessary to complete the Transaction as set out in greater detail below." (bold in original)); Trial Tr. at 133:22–134:6 (Pallan).

23

(the "Purchase Agreement") and if no superior offer emerged, Feronia would initiate insolvency proceedings in Canada "for the exclusive purpose of implementing the Transaction on an expedited basis, subject to court approval."[127] Steps 3 through 6 played out as planned. Feronia engaged Ernst & Young as its advisor.[128] Seruma hired DLA Piper to prepare the stalking horse bid.[129] Seruma circulated the bid to Kuramo for comment on June 28, 2020,[130] and submitted it to Ernst & Young on June 30, 2020.[131] No superior proposal emerged, and Feronia initiated insolvency proceedings in Canada in July 2020.[132]

In Steps 7 and 8, concurrent with the commencement of the insolvency proceedings, the Consortium would deliver a binding funding commitment and equity support agreement, and Feronia would accept the offer set out in the Purchase Agreement.[133] That happened on July 17, 2020.[134]

---

[127] Support Agr. at 14.

[128] JX-777 at 14–18.

[129] Trial Tr. at 173:15–174:3 (Pallan).

[130] JX-661 at 1.

[131] JX-680 at 1; *see also* Trial Tr. at 179:18–181:18 (Pallan).

[132] *See* JX-849 at 1 (Canadian Bankruptcy Court Approval and Vesting Order).

[133] Support Agr. at 14 ("Concurrent with the commencement of the Proposal Proceedings, the Equity Subscription would be completed, including delivery by the Sponsor of the Binding Funding Commitment."); Trial Tr. at 135:4–8 (Pallan).

[134] JX-749 at 1, 3, 9.

In Step 9, the parties would complete the debt restructuring, and the DFI Lenders would write off or restructure their debt.[135] Seruma and the DFI Lenders signed a debt restructuring term sheet in July 2020,[136] and a formal agreement in November 2020.[137] Seruma negotiated both agreements for the Consortium.[138]

The Restructuring Transaction closed on November 19, 2020.[139]

## C. The Falling Out

After the Restructuring Transaction closed, the Consortium had to select a director general of PHC. Seruma wanted to serve in that role.[140] Adeosun did not believe that Seruma was the right choice.[141] On January 22, 2021, Adeosun told Seruma that he would neither be the director general of PHC, nor its permanent CEO.[142] That upset Seruma to the point that Seruma told Adeosun the parties "should start negotiations on a complete separation of Nile and Kuramo."[143] But

---

[135] Support Agr. at 14 ("Concurrent with the acquisition of the Shares and Intercompany Loans by the Purchaser pursuant to the Share & Asset Purchase Agreement, the Transaction Parties will complete the Debt Restructuring described below.").

[136] JX-751 at 29.

[137] JX-1046 at 1, 7, 22.

[138] *See* JX-713 at 1, JX-718 at 1; JX-1417 at 1 ("In the restructuring negotiations, my understanding was that DLA Piper [and Seruma] represented what I deliberately . . . subsume here under '[KKM2].'").

[139] JX-1041 at 1.

[140] *See* Trial Tr. at 588:10–19 (Adeosun).

[141] *See id.* at 584:10–585:20 (Adeosun).

[142] *See* JX-1187 at 2.

[143] *See* JX-1196 ("I feel very aggrieved!").

25

Seruma did not negotiate. Instead, he engaged in self-help. This led to a falling out between the parties, which prompted Kuramo to investigate Seruma's actions. Through that investigation, Kuramo started to learn of Seruma's secret dealings concerning Mpala and KN Agri. In an effort to increase his leverage, Seruma also purported to have written off all of Kuramo's interests in KN Agri. Seruma further interfered with the DFI Lenders' efforts to complete the restructuring. That ultimately backfired, and the DFI Lenders refused to deal with Seruma.

On February 4, 2021, Adeosun traveled to Kinshasa to meet with Seruma.[144] In anticipation of the meeting, Pallan sent Adeosun an email laying out Kuramo's investments and how Kuramo could go about separating from Nile.[145] The two met on February 4 and 5.[146] They were scheduled to meet again on February 6, but Seruma said that he was sick and could not meet.[147] Come February 7, Seruma again said he was too sick to meet.[148]

On February 8, Adeosun and Mpinga traveled to the PHC estate, which was hundreds of miles away from Kinshasa.[149] While Adeosun and Mpinga were hundreds of miles away, Seruma asked PHC's then-Chairman George Buse to

---

[144] Trial Tr. at 588:2–590:10 (Adeosun); JX-1222 at 1; *see* JX-1218 at 1.

[145] JX-1218 at 1; Trial Tr. at 271:5–275:18 (Pallan).

[146] *See* JX-1222 at 1.

[147] *Id.*

[148] *Id.*

[149] Trial Tr. at 588:10–591:4 (Adeosun).

schedule an urgent PHC board meeting to select PHC's next director general.[150] Buse complied and called a board meeting for February 9.[151] The purpose of the board meeting was to select the director general of PHC.[152] At trial, Seruma testified that the single-day notice was necessary because PHC's lawyers stated that filing the vacancy was "a critical piece in terms of risk management" and "should be done urgently."[153]

Also on February 8, Seruma emailed Buse unsigned resignation letters from Raymond Batanga and Mpinga, two directors of the PHC board.[154] Seruma then sent a second email to Buse purporting to install two new Feronia KNM directors to the PHC board.[155]

Adeosun and Mpinga received notice of the February 9 meeting and raced back to Kinshasa.[156] They made it in time.

---

[150] *See* JX-1233 at 1 ("Larry, you are not picking up my calls. I understand you have called a Board meeting to become the DG of PHC. This is not what we agreed to and it is not acceptable. You need to stop this right now."); Trial Tr. at 590:20–592:3 (Adeosun); Trial Tr. at 702:8–15 (Gieskes).

[151] *See* Trial Tr. at 702:8–15 (Gieskes).

[152] *Id.*

[153] *Id.* at 906:10–23 (Seruma); *see also* JX-3052 at 1. The purported urgency was identified two weeks prior, on January 25, 2021. JX-3052 at 2 ("the Chairman of PHC should convene a meeting of the Board of Directors in the coming days to fill the vacancy in the post of the Managing Director.").

[154] JX-1241 at 2, 4.

[155] JX-1240 at 1.

[156] Trial Tr. at 590:11–592:10 (Adeosun).

27

In transit, Adeosun and Mpinga sent a letter to the chair of PHC as "the 99% beneficial owners of Feronia KNM, the entity owning the shares of Feronia Maia, and as the previous owners of the KKM controlling entity," to inform the chair that Seruma's proposed nomination "is an unauthorized action" which the pair protests.[157]

During the board meeting, Adeosun pulled Seruma aside and told him that if he proceeded to make himself the director general of PHC, then Kuramo would terminate its relationship with Nile.[158] In response, Seruma said that he would not be bullied.[159] Seruma forwarded his name to be the director general, but the board voted against that proposition.[160] The board chose Monique Gieskes as the director general.[161]

Seruma stayed in the DRC to wait for a stockholder meeting, where he hoped to seize control of PHC.[162] At trial, he testified credibly that he felt unsafe during

---

[157] JX-1249 at 3 (2/9/21 Ltr.).

[158] Trial Tr. at 592:12–22 (Adeosun).

[159] *Id.* at 911:15–20 (Seruma); *id.* at 592:23–593:1 (Adeosun stating Seruma responded: "I guess that's the way it's going to be.").

[160] *Id.* at 593:2–8 (Adeosun).

[161] *Id.*

[162] *Id.* at 915:5–11, 919:6–13 (Seruma) ("I did remain in the Congo that period of time, primarily to wait for the shareholder meeting on February 25th, because that was [his] opportunity to replace the board.").

this time.[163] He was unsuccessful in replacing the board at the stockholders meeting,[164] and after the meeting, he returned to the United States.

On February 10, 2021, Kuramo sent Seruma a notice of termination of the Amended Nile LLC Agreement and demanded that its assets be redeemed immediately.[165] Seruma refused to redeem Kuramo's assets, arguing that a five-year lock-up provision bars Kuramo from redeeming its assets before June 30, 2022.[166]

### D. The Misappropriation

Immediately after the falling out, on February 10, Kuramo reached out to Nile's fund administrator, IQEQ, to request a breakdown of Kuramo's ownership percentages in NGFF and KN Agri.[167] IQEQ reported that Kuramo had gone from owning 93.37% and 97.16% of these entities pre-2020 to now owning 53.27% and 26.93%, respectively.[168] Another IQEQ Capital Statement detailed that Kuramo was the 28.12% owner of KN Agri as of December 2019.[169] The statement was dated

---

[163] *Id.* at 915:18–916:3 (Seruma) (testifying that those "close" to him were being "rounded up"); *id.* at 921:21–922:1, 923:17–924:2 (Seruma) (testifying that someone at the United States Embassy in the DRC told him to leave the country for his safety).

[164] *Id.* at 923:2–6 (Seruma).

[165] JX-1270 at 2 ("This Letter is formal notice to Larry Seruma of the intention by Kuramo Capital Management, LLC to immediately terminate the LLC Agreement. Pursuant to the LLC Agreement, we require a full redemption of all our beneficially-owned assets invested in, among other entities, [NGFF], and KN AGRI LLC."); *see* Trial Tr. at 280:22–283:2 (Pallan).

[166] *See* Trial Tr. at 914:4–12 (Seruma).

[167] *See* JX-1290 at 1.

[168] *Id.*; JX-232 at 2–3.

[169] JX-1289 at 3.

29

December 31, 2019, but IQEQ had not provided it previously because Seruma had instructed it not to.[170] This alarmed Kuramo, to put it mildly.

It got worse. On February 15, Seruma emailed a letter to the DFI Lenders, copying the Kuramo team. In the letter, Seruma claimed that "Kuramo has a zero % shareholding in KN Agri," as a consequence of the Feronia insolvency proceedings.[171] Seruma further claims that Kuramo defaulted on the 2020 Bridge Loan and, as a result, lost its ability to redeem the loan or convert it to equity.[172] In other words, Seruma claimed that Kuramo went from beneficially owning 97% of the PHC Shares to beneficially owning an unknown minority percentage. Even more unbelievable, Seruma next claimed to, personally, beneficially own a majority interest in the PHC Shares.[173]

Tracing Seruma's path from 1% to a majority interest has proven extremely difficult, but there are four critical parts to the story.

First, to understand Seruma's actions, one must understand the parties' agreement to restructure KN Agri as a Series LLC. Before the Restructuring Transaction, Seruma contributed to KN Agri a Ugandan farm called "Mpala," which

---

[170] Trial Tr. at 286:16–287:10 (Pallan). Kuramo had never seen that document. Trial Tr. at 286:4–15 (Pallan). And an IQEQ administrator tried to recall the email immediately after sending it. JX-1288 at 1.

[171] JX-1317 at 4–5 ("The Series B investment is written off to zero because Feronia Inc as a result of the bankruptcy. So as of the December 2020 accounts under audit, Kuramo has a zero% shareholding in KN Agri.").

[172] *Id.* at 4.

[173] JX-1833 at 3–4, 22 ("The Nile Parties, directly and indirectly, own a majority of [PHC].").

30

Seruma valued at just over $20 million. Kuramo did not agree to the transfer, but later assented after Seruma proposed that the parties restructure KN Agri as a Series LLC, and that Mpala would be ring-fenced so as to not dilute Kuramo's interests in the PHC Shares. The parties agreed to protections for Kuramo in Series B and to place the PHC Shares in Series B and Mpala in Series C (the "Ring-Fence Agreement").[174] Much of what Seruma did from this point forward appears geared to evade the Ring-Fence Agreement.[175]

Second, during the Restructuring Transaction, Seruma formed the NewCo (Feronia KNM) as a subsidiary of KN Agri, and not the Consortium, although the Support Agreement required that NewCo be a wholly owned subsidiary of the Consortium.[176] Seruma made Kuramo aware of this change,[177] but Seruma had told Kuramo that Feronia KNM would be placed in Series B, so Kuramo tacitly assented to the change. Contrary to his representations, and unbeknownst to Kuramo, Seruma then placed Feronia KNM in Series A instead of Series B (the "NewCo Maneuver").

Third, during the Restructuring Transaction, Seruma transferred Mpala out of the agreed-upon ring-fenced structure to NGFF, although the original NGFF LLC Agreement did not permit in-kind capital contributions. Seruma secretly took the

---

[174] Trial Tr. at 163:2–11 (Pallan); JX-344 at 2.

[175] *See* JX-1113 at 1–2; JX-1134 at 1–2; JX-1191 at 1.

[176] Support Agr. at 13 (stating the purchaser will be a wholly-owned subsidiary of the Consortium); *see* Trial Tr. at 121:1–123:17 (Pallan); JX-437 at 1 (email from Pallan stating: "KKM will own 100% of the equity of the NewCo holding company").

[177] JX-568 (email from Seruma stating "KN Agri LLC will be the sole shareholder of NEWCO at setup").

position that this transfer dramatically increased his stake in NGFF and beneficial ownership interests over the PHC Shares from 1% to an unspecified majority interest (the "Mpala Relocation").

Finally, Seruma formulated a theory that Kuramo had agreed to a 60/40 split of KN Agri. Mpala entitled Seruma to 60% and fully funding and converting the 2020 Bridge Loan entitled Kuramo to 40%. According to Seruma, because Kuramo failed to fully fund and convert the 2020 Bridge Loan, he was the sole beneficial owner of KN Agri and, in turn, the PHC Shares (the "1% to Majority Theory").

### 1. The Ring-Fence Agreement

As discussed above, the parties formed KN Agri for the immediate purpose of effectuating the 2018 Bridge Loan, but the entity was intended to serve other purposes as well. Since at least May 2018, Kuramo and Seruma had discussed forming a "food" or "agribusiness" fund.[178] When they formed KN Agri, they intended it to grow into the contemplated "food fund."[179] In their discussions concerning KN Agri's growth as a food fund, Seruma told Kuramo that he wanted to contribute his personal Mpala interests into KN Agri at a value of $20 million.[180]

Seruma produced evidence at trial to support the $20 million valuation, but it is hard to credit the evidence for the following reasons:

- The basis of the valuation is a 2019 analysis by valuation/appraisal firm Barfric Property Company Limited that used "the Sales Comparison

---

[178] Trial Tr. at 58:11–20 (Pallan); *see* JX-88 at 1.

[179] Trial Tr. at 58:11–60:5, 140:3–143:9 (Pallan); *see* JX-178 at 1.

[180] Trial Tr. at 142:14–144:17 (Pallan); JX-199 at 1.

approach and Cost Approach" to value Mpala.[181]  The report stated that the market value of Mpala was 74 billion Ugandan Shillings as of December 31, 2019.[182]  The report goes on to list four properties that the report calls "comparable," listing the ownership interest, acreage, selling price, and locality characteristics.[183]  The report concludes without any analysis, that "[a]fter a careful consideration of all the relevant factors, we are of the opinion that the Fair Value for Bookkeeping Purposes of the property is in the sum of UGX. 74,000,000,000- (Uganda Shillings Million Only)."[184]

- MAMM & Associates later issued an audit report concluding that Mpala was worth approximately $20.2 million as of December 31, 2019.[185]  This report appeared to rely on either Seruma or the Barfric valuation.  Two months before it was issued, the draft MAMM report had valued the property at approximately $10 million.[186]

- Cohen & Co. issued a valuation memo for KN Agri LLC on June 29, 2020, "[t]o obtain an understanding of the Appraiser's and the Advisor's inputs and assumptions used to determine the value of MPALA Limited held in the Fund as of year-end."[187]  Cohen discussed the work performed by the appraiser, Barfric, and the auditor, MAMM, and concluded "[b]ased on the testing performed, . . . that the appraiser [sic] prepared by the specialist can be relied upon as support for the property value used in the calculations of fair value and that the net asset value of MPALA is a reasonable estimate of fair value as of year-end."[188]

- BDO prepared an equity valuation report for Mpala in July 2021.  BDO valued Mpala at $23.4 million as of December 31, 2020.[189]  But the BDO

---

[181] JX-1681 at 3

[182] *Id.* at 5.

[183] *Id.* at 12.

[184] *Id.* at 13 (bold omitted).

[185] JX-275 at 10 (signed June 26, 2020).

[186] JX-408 at 21 (April 13, 2020 email, valuing the property at 37 billion Ushs as of December 31, 2019, which was approximately $10 million); *see also* JX-355 (March 14, 2020 email from Seruma to Mpala auditor stating "we value the farm . . . at $20M USD").

[187] JX-273 at 1.

[188] *Id.* at 3.

[189] JX-1679 at 18, 31.

33

report is flawed too in that to arrive at the property value, BDO looked at Mpala's book value, which was based on Mpala's auditor's financial statements.[190] The audited financial statements were based primarily on Mpala's land value.[191] And that land value was based on an unnamed property valuer's unexplained conclusion.[192]

Maybe Mpala is worth what Seruma claims. Or maybe it is worth more. Or maybe it is worth less. The evidence on this point is insufficient. In all events, Kuramo had serious concerns about Seruma's proposal to contribute Mpala to KN Agri. At the time, KN Agri was a non-series, "pooled" vehicle.[193] By May 31, 2019, KN Agri had a total capitalization of $9,155,753, of which Kuramo had contributed $8,895,890.[194] Kuramo thus was the beneficial owner of 97.16% of KN Agri and faced the prospect of having that interest diluted in favor of Seruma personally, based not on cash but on an in-kind contribution of Ugandan farmland of unknown value. Kuramo objected to the proposal.[195]

To address these concerns, Seruma proposed reorganizing KN Agri as a Series LLC and placing the Feronia interests in separate ring fenced series to protect

---

[190] *Id.* at 31, 45.

[191] JX-275 at 6.

[192] *Id.*

[193] *See* KN Agri LLC Agr. at 3–5.

[194] JX-167 at 2; JX-213 at 2.

[195] Trial Tr. at 144:1–145:14, 147:11–15, 149:19–150:8, 152:1–153:17, 160:3–15 (Pallan).

Kuramo from dilution connected to Mpala.[196]  Kuramo agreed to this proposal in September 2019.[197]

By the end of 2019, KN Agri's financial statements reflected three series.[198] Series A held a $2.4 million investment in Mpala, which was transferred to KN Agri from NGFF.[199]  Series B held Kuramo's investment.  And Series C held Mpala, which Seruma valued at approximately $20 million.

The parties later memorialized the reorganization by executing a supplement to the Amended KN Agri LLC Agreement for each series in June 2020—the "Series

---

[196] *Id.* at 142:14–145:14 (Pallan); *see* JX-199 at 1; JX-880 at 16.

[197] *See* Trial Tr. at 144:21–145:9 (Pallan).

[198] JX-880 at 16; *see also* JX-1407 (supplemental agreements for each series).

[199] JX-880 at 16.  The background on this investment is suspect.  In December 2019, Seruma asked Kuramo to make a direct investment of $2.5 million in Mpala.  JX-271 at 1.  In response, Pallan asked for support for the $20 million valuation of Mpala. JX-284 at 1.  Seruma did not want to provide this information.  JX-285 at 2 ("I am not providing anymore information.").  And so Kuramo declined the investment opportunity.  *See* Trial Tr. at 158:18–159:3; JX-291 at 1–2; JX-299 at 1.  Instead, Seruma caused NGFF to make the direct investment into Mpala.  JX-239 at 2–4.  In January 2020, an associate of Seruma, Sammy Hung, informed Kuramo that NGFF had invested $2.4 million into Mpala and the investment had been novated to KN Agri in the form of Series A.  Trial Tr. at 167:7–169:2 (Pallan); *see* JX-285 at 3 (discussing Hung's communication to Kuramo); JX-704 at 1–2.  Kuramo was not aware that Seruma had even caused NGFF to make that investment.  Trial Tr. at 167:7–168:21 (Pallan).  The $2.4 million investment from NGFF into Mpala was placed in Series A.  Trial Tr. at 167:19–168:5 (Pallan); JX-704 at 1–2; JX-880 at 16. From that point forward, KN Agri held a $2.4 million investment in Mpala through Series A, but purportedly also held the entirety of Mpala through Series C.  JX-880 at 16.

A Supplement," "Series B Supplement," and "Series C Supplement."[200]  The Series B Supplement differed from the other two in multiple ways, two of which are of note.

First, each supplement identified the "investment objective" as follows: "to seek superior long-term total returns by investing in . . . a variety of markets in Frontier Countries."[201]  The supplements for Series A and Series C defined 28 countries as "Frontier Countries" and the DRC was not among the 28.[202]  By contrast, the Series B Supplement defined "Frontier Countries" as the DRC.[203]

Second, the Series A and Series C supplements did not identify specific members, making NGFF their only member by default.  By contrast, the Series B Supplement identified Kuramo and NGFF as its members.

To sum it up, reorganizing KN Agri as a series LLC was Seruma's idea.[204] What Kuramo cared about was not having its interests diluted by Seruma's proposed contribution of his personal Mpala interests.[205]  Creating separate series— "ring-fencing" Kuramo's Feronia investment from Seruma's personal Mpala interests— represented the means Seruma selected for effectuating that agreed-upon outcome.[206]

---

[200] JX-1407 at 35 (Series A Supplement); JX-1227 at 2 (Series B Supplement); JX-1407 at 28 (Series C Supplement).

[201] JX-1407 at 35 (Series A Supplement); JX-1227 at (Series B Supplement); JX-1407 at 28 (Series C Supplement).

[202] JX-1407 at 41 (Series A Supplement); JX-1407 at 34 (Series C Supplement).

[203] JX-1227 at 13.

[204] Trial Tr. at 144:18–20 (Pallan).

[205] *Id.* at 143:3–24 (Pallan).

[206] *See id.* at 144:21–145:14 (Pallan).

The Series supplements accomplished this in part by: making Kuramo a member of Series B; identifying the Series B investment's objective as the DRC; and excluding the DRC from the Series A and Series C Supplements.

### 2. The NewCo Maneuver

As discussed above, pursuant to the Support Agreement, the Consortium formed Feronia KNM in June 2020 to make the stalking horse bid.[207]  But instead of forming that entity as a wholly owned subsidiary of the Consortium as required by the Support Agreement,[208] Seruma formed it as a wholly owned subsidiary of KN Agri.[209]  This had the effect of cutting Mafuta out of the Feronia interests.  Seruma made Kuramo aware of this change.[210]

Kuramo was not concerned by the change at the time, and for good reason. Namely, Seruma had repeatedly represented to Kuramo that Feronia KNM would be held in Series B.[211]  This was consistent with the Series supplements, which identified

---

[207] *Id.* at 199:7–19 (Pallan); *see* JX-580 at 1.

[208] Support Agr. at 13 (stating the purchaser will be a wholly-owned subsidiary of the Consortium).

[209] JX-568 at 1 (email from Seruma stating "KN Agri LLC will be the sole shareholder of NEWCO at setup").

[210] Seruma informed Kuramo that the NewCo would be formed as a subsidiary of KN Agri "[a]s an FYI." JX-568 at 1.

[211] Trial Tr. at 244:2–252:11 (Pallan); JX-842 at 1 (hand-written notes); JX-1052 at 1 (November 23, 2020 email from Pallan to Seruma stating: "The only subscriber to KN Agri series B from Kuramo would be Kuramo Agri. We need to ensure audited NAV reporting by March 31 of each year. Ideally we can do this in 2020 or if in 2021 then with an effective date of Dec 31.").  Seruma explained that he chose Series A to protect an investor, the Segal Family Foundation, despite Seruma never mentioning Segal until trial.  Trial Tr. at 1202:4–1204:12 (Seruma).  Seruma's decision cut out Mafuta because Mafuta had no interest in KN Agri.

37

the DRC investments on the Series B Supplement exclusively. Also, the Series supplements were finalized in June 2020, after the Support Agreement was inked and when the parties were embarking on the Restructuring Transaction. Put differently, when the Series supplements were executed, the only existing investment in the DRC was about to be extinguished through Feronia's bankruptcy proceeding.[212] So there was only one reason to finalize the Series B Supplement specific to the DRC—to hold the post-restructuring interests in PHC.

Seruma, however, did not place Feronia KNM in Series B. Rather, Seruma placed Feronia KNM in Series A, which lacked the Series B protections for which Kuramo had negotiated.[213]

### 3. The Mpala Relocation

By placing Feronia KNM in Series A, ownership defaulted to the ownership structure of KN Agri, whose sole member was NGFF. To seize control of Feronia KNM, Seruma increased his ownership percentage in NGFF by transferring Mpala to NGFF.

On December 21, 2020 (after the Restructuring Transaction closed), Seruma emailed KN Agri's fund administrator, IQEQ, and asked for a shareholder register

---

[212] As explained by Seruma's expert Marti P. Murray, "Feronia Legacy Common was extinguished in the insolvency proceeding, and once reorganized, old equity had no interest in the assets that were sold by Feronia to the Purchaser (Feronia KNM)." JX-1806 ¶ 107 (Murray Report) (citations omitted).

[213] Trial Tr. at 243:11–17 (Pallan) ("Q. Mr. Pallan, sitting here today, are you aware that one of the specific ways in which Mr. Seruma purports to have achieved this result is by implementing the transaction through a series of KN Agri in which Kuramo had no direct interest, specifically Series A? A. Yes, I'm aware of that now.").

for NGFF as of October 31, 2020 (before the Restructuring Transaction closed).[214]  In that email, Seruma instructed that "the $20,155,027 Larry Seruma investment in KN Agri LLC will show in NGFF."[215]  IQEQ responded months later, on March 16, 2021, stating that the Mpala investment "was recorded by KN Agri in 2019 but nothing was not [sic] recorded in NGFF in 2019."[216]  IQEQ asked for "the relevant subscription docs both from you into NGFF and from NGFF to KN Agri so that [IQEQ] can record this in 2020."[217]  On March 30, 2021, Elizabeth Seruma emailed Larry Seruma a document titled "Seruma Additional Subscription 10 2020."  Both she and Seruma had signed the document, which purported to grant them founders shares of NGFF in exchange for an "investment amount" valued at $20,155,027—the value Seruma had ascribed to Mpala.  The document was dated October 16, 2020.[218]  Seruma sent this to IQEQ in response to the March 16, 2021 request.[219]

At trial, Seruma argued that transferring Mpala was "in aid of the parties' plan to consolidate their agribusiness investments."[220]  But there is no contemporaneous evidence suggesting that the plan for consolidating the agribusiness investments involved moving Mpala in NGFF from its ring-fenced position in KN Agri.  The

---

[214] JX-1351 at 3.

[215] *Id.*

[216] JX-1460 at 1.

[217] *Id.*

[218] JX-1492 at 1–3.

[219] JX-1491 at 1.

[220] Nile Post-Trial Opening Br. at 35.

39

evidence reflects that Kuramo did not want Mpala to be part of the mix at all and restructured KN Agri as a Series LLC to protect Kuramo from exposure to Mpala.

As an independent reason for transferring Mpala to NGFF, Seruma argued that, post-restructuring, the Consortium was starting from a blank slate. All prior ownership interests in Feronia were removed from the books, and they were "'effectively starting a new company with new money.' So, to secure their respective post-restructuring economic stakes in PHC, Kuramo, Nile, and Mafuta had to contribute new money."[221] In all events, Seruma's "new money" contribution was Mpala.

There are obvious problems with the new-company and new-money explanation. For one, the math here is really fuzzy. There appears to have been some unallocated contributions by Kuramo to NGFF that, even under Seruma's narrative, were not affected by the Restructuring Transaction.[222] Seruma is intentionally vague on this point. But also, Mpala was not exactly "new money"—again, it had already been contributed to KN Agri in a ring-fenced structure. But to get to a position that the Nile Parties like, they had to take the narrative yet another step.

---

[221] Nile Post-Trial Opening Br. at 57 (quoting Trial Tr. at 1284:1–8 (Lamek)).

[222] *See generally* JX-1821 (reflecting Kuramo's $15,000,000 investment in NGFF); JX-32 (reflecting Kuramo's $3,000,000 investment in NGFF); JX-45 (reflecting Kuramo's $5,000,000 investment in NGFF), JX-72 (reflecting Kuramo's $2,000,000 investment in NGFF).

### 4. The 1% To Majority Interest Theory

Here comes more interesting math. According to the Nile Parties, Kuramo's investment in NGFF was reduced dramatically (again, fuzzy math—they do not say how much) as a consequence of the Restructuring Transaction and provisions of the NGFF LLC Agreement that allow Seruma to recalculate membership rights based on net asset value.[223] According to Seruma, the parties agreed that, in exchange for Mpala, Seruma would acquire a 60% interest in KN Agri. And in exchange for fully funding and then converting to equity the $15 million 2020 Bridge Loan, Kuramo would acquire a 40% interest in KN Agri. But because Kuramo neither funded the 2020 Bridge Loan nor converted it into equity, Kuramo lost all equity in KN Agri, rendering Seruma the sole beneficial owner of the PHC Shares.

But there's more. Because it appears NGFF still holds millions of dollars of Kuramo's investment in Series P, the only way for Seruma to be able to claim complete ownership of the PHC Shares and yet a 50–60% ownership interest in NGFF is if Seruma separated the KN Agri investment to only the Founder Series, which is where Seruma placed Mpala.[224]

---

[223] *See generally* Nile Post-Trial Answering Br. at 25–27.

[224] Seruma did not take this position at trial, but it does square with certain aspects of the record and explains how Seruma could be correct that he owns 100% of the PHC Shares and yet beneficially owns only 50–60% of NGFF. This would mean that the Nile Parties' trial demonstrative showing that NGFF was supposed to be the 60% owner of KN Agri is inaccurate, and the demonstrative should state that "NGFF Founders Series" is the 60% owner of KN Agri. *See* JX-1549 at 11 (New York motion for injunction brief) ("A ring-fenced interest means that none of the Kuramo entities have any membership interest in non-Series B investments, including PHC and Feronia KNM, all of which are not related to either the Series B interests (or the

41

At least, this is what Seruma seems to be arguing. It has been far from clear throughout this litigation because Seruma refused to provide straight answers or take clear positions.

- In response to Kuramo's October 14, 2021 interrogatory asking Seruma to provide a percentage ownership breakdown of NGFF, Seruma objected on the ground that the question was "vague" and "overbroad."[225] This objection gave rise to a motion to compel.

- At oral argument on the motion to compel, Seruma's attorney stated that they never took the position that Larry and Elizabeth Seruma owned 100 percent of NGFF. Counsel stated, and rightly so, that the ownership of NGFF was not affected by the bankruptcy.[226]

- But in court-ordered discovery, the Nile Parties continued to refuse to take a firm position on the ownership break-down.[227]

---

Series P interests for that matter)."). This is consistent with other statements Seruma made. JX-1292 at 2 (Seruma stating on December 21, 2020 (post-restructuring) that Kuramo Master Fund II and Larry Seruma are the only two "shareholders with 10% or more holdings in NGFF"); JX-1875 at 13 (RFA Response No. 25) ("the Kuramo Parties do not possess an ownership interest of any kind in PHC").

[225] Dkt. 35, Ex. A, Interrogatory No. 9.

[226] Dkt. 200 at 32:2–15 (1/20/23 oral argument on Kuramo's motion to compel) (counsel stating: "This is not correct that Larry and Elizabeth Seruma owned 100 percent of [NGFF]. That's just not right. We never took that position. Okay? And I will go without -- if they really dispute this, who owns [NGFF], it's in a document. It's in the subscription document. I believe it's 51 in favor of Mr. Seruma and his affiliates and 49 percent in favor of the Kuramo Fund. No one has ever taken the position that Larry and Elizabeth Seruma own 100 percent of [NGFF]. Never. And I will undertake to identify the documents that set forth the relative ownership of that entity. None of that was affected by the bankruptcy.").

[227] JX-1692 at 6–7 (supplemental interrogatory response) ("[T]he Nile Fund Parties state the capital contributions made to [NGFF] during the relevant time period as follows. Kuramo Africa Opportunity Master Fund II, LP, contributed $23,000,000 in 2017 and $2,000,000 in 2018. Larry Seruma and Elizabeth Seruma contributed $20,155,027.08 in 2020. The Nile Fund Parties state that they identified the capital contributions using the Shareholder Register at 12/31/2020 authored by IQ-EQ (US)

- With his pre-trial brief, Seruma attached an exhibit purporting to show NGFF's ownership structure after the Restructuring Transaction. The exhibit listed Larry and Elizabeth Seruma, Segal, and Kuramo as owners but did not provide their ownership percentages.[228]

- At trial, Seruma was asked what percentage of NGFF he and Elizabeth Seruma own. Seruma testified that it was somewhere between 50% to 60%.[229]

- In post-trial briefing, the Nile Parties claimed that The anticipated 60/40 (Nile/Kuramo) ownership split of KN Agri remained aspirational because Kuramo CIV III never fully funded the $15 million Bridge or converted it into equity in KN Agri."[230] The implication was that, because Kuramo never funded the 40%, nor converted to equity, Kuramo owned little or no equity.

- In their post-trial answering brief, the Nile Parties implied Seruma had a 100% beneficial ownership in NGFF, arguing that all (or near all) of NGFF is Mpala.[231] But at the same time stated that the parties' intent was that "KN Agri . . . would hold both PHC and Mpala."[232]

---

Inc. The Nile Fund Parties further state that [NGFF] uses the valuation methodology described in the 'Net Asset Value and Valuation' section of [NGFF]'s Confidential Offering Memorandum, dated September 3, 2013.").

[228] Dkt. 257, App'x C.

[229] Trial Tr. at 1060:5–1063:11 (Seruma); *see also id.* at 1059:8–15 (Seruma) ("Q. So let me ask, though. The 60 percent is based primarily on the $20 million valuation of Mpala; correct? A. Not primarily. But I would say the valuation in Mpala would be at the KN Agri level, yes. I'm sorry. I misunderstood the question. At the KN Agri level, yes, the Mpala would be, you know, the 60 percent.").

[230] Nile Post-Trial Opening Br. at 64–65 (cleaned up).

[231] Nile Post-Trial Answering Br. at 21 ("Kuramo does not dispute that Feronia Inc.'s equity is worthless. Nevertheless, Kuramo claims that their historical equity investments would continue to count fully in the new investment structure. That claim cannot be squared with the 60/40 (Nile Kuramo) split of KN Agri, which was premised on the ascribed value of Mpala (23/38 = 60%) and Kuramo's conversion of the Bridge Loan to equity (15/38 = 40%)." (cleaned up)).

[232] *Id.* at 88.

Here is the problem: There is no evidence that Kuramo agreed to a 60%/40% post-Restructuring Transaction split. In fact, Pallan had rejected this allocation of interests multiple times when Seruma attempted to have Pallan approve organizational charts reflecting the break-down.[233] Around February 2021, Pallan learned that a junior employee at Kuramo had signed an organizational chart sent to him from Seruma stating that Kuramo was the 40% owner of KN Agri, and NGFF was the 60% owner.[234] This was the same organizational chart Pallan had told Seruma was incorrect.[235] When Pallan found that a junior employee had signed off on the organizational chart that Seruma had supplied, after Pallan rejected them, Pallan emailed CDC stating "the 60/40 split is not correct at the KN AGRI level – that was a representation by Larry. We own 97.5% of the beneficial assets of KN AGRI – these are in the Series class directly related to Feronia."[236]

The notion that Seruma would receive a majority interest in NGFF or KN Agri post-restructure is inconsistent with Seruma's statements to Kuramo during the Restructuring Transaction. As Seruma implemented the steps of the Support Agreement, he consistently communicated to Kuramo that Kuramo would continue to hold a majority interest in NGFF, KN Agri, and Feronia KNM post-restructuring.

---

[233] JX-1119 at 1; JX-1120 at 1; Trial Tr. at 294:3–297:8 (Pallan).

[234] JX-1305 at 1.

[235] Trial Tr. at 293:12–294:2 (Pallan); JX-1152 at 1–3. Seruma had sent the junior employee the incorrect chart three days after Pallan told Seruma: "you seem to forget I am the 99% beneficial owner of this asset!" JX-1133 at 1. And a week after Pallan expressly rejected this chart. JX-1120 at 1–3.

[236] JX-1305 at 1.

- On July 10, August 19, October 16, November 10, and December 10, 2020, Seruma circulated an organizational chart stating that Kuramo was a 97.16% owner of KN Agri.[237]  On July 10, 2020, Seruma verified the accuracy of the organizational chart.[238]

- On September 16, 2020, Seruma told Pallan: "You own 97 percent of whatever is Nile and whatever – this is what I said to you.  Whatever it is in Nile you own a majority of it, 97 percent."[239]  Seruma continued: "it's really the entire fund because the entire fund is owned by you."[240]

- On September 28, 2020, in response to Pallan asking Seruma: "So I do see that it's an investment but ultimately we're the hundred percent beneficial owner, right?" Seruma answered: "Yeah."[241]

- On September 29, 2020, Seruma told Pallan: "[A]s far as I'm concerned, my interest in this business and Kuramo are completely aligned because it's a financial investment. You know, whatever money I make falls into Kuramo or whatever it is falls into Kuramo."[242]  Seruma continued, "everything goes back to Kuramo. That's what I'm saying. Everything goes back to Kuramo."[243]

- In December 2020, after the Restructuring Transaction closed, Seruma provided the DFI Lenders and Kuramo an organizational chart, as part

---

[237] JX-719 (July 10, 2020); JX-721 (July 10, 2020); JX-806 (Aug. 19, 2020, accurate as of July 11, 2020); JX-808 (Aug. 2020); JX-959 (Oct. 2020); JX-1009 at 4 (Nov. 2020). The November chart was intended to reflect the parties' post-transaction ownership interests.  Trial Tr. at 208:14–209:21 (Pallan).  Seruma approved the memo, which included the organizational chart. *See* JX-1102 at 1; Trial Tr. at 208:14–211:24, 254:11–256:22 (Pallan).

[238] *See* JX-724 at 1–2.  It looks as if Seruma viewed himself as the majority owner of KN Agri after he contributed Mpala to Series C, even though the parties had negotiated to protect Kuramo from dilution resulting from that transaction.  The evidence of this is JX-715, which reflects that on July 9, 2020, Seruma had caused KN Agri to show he was its majority owner.  Because the claim changed to the NGFF level when Seruma moved Mpala, this decision does not dig into the circumstances of the July 9 communication found in JX-715.

[239] JX-875 at 22:10–16 (Sept. 16, 2020 call between Seruma and Pallan).

[240] *Id.* at 22:23–24.

[241] JX-898 at 18:1–4 (Sept. 28, 2020 call between Seruma and Pallan).

[242] JX-901 at 19:7–12 (Sept. 29, 2020 call between Seruma and Pallan).

[243] JX-901 at 29:20–22 (Sept. 29, 2020 call between Seruma and Pallan).

45

of the BIO report, showing that Kuramo held a 97.16% ownership interest in KN Agri.[244]

- Throughout the Restructuring Transaction, Seruma stayed silent when Kuramo explained what it believed to be the terms of the deal Seruma was overseeing.[245]

Moreover, throughout the Restructuring Transaction, Seruma was tasked with and understood his role to "act in the best interest of Kuramo."[246]

There is also no factual support for Seruma's claim that Kuramo refused to fund the 2020 Bridge Loan. Seruma testified that in November and December 2020 he made "multiple asks to Kuramo to lend the full" $15 million, but "[t]hat did not happen."[247]

---

[244] JX-1102 at 4.

[245] JX-663 at 7 (Seruma failing to respond to Adeosun's text from July 2020 where Adeosun stated: "We are getting 100% of the company for $15M and saving our $26M investment. You would do that deal all day."); JX-842 at 1–4 (September 2020 Pallan and Seruma drawing the structure to show that KN Agri Series B was holding Feronia's PHC interest); Trial Tr. at 246:12–249:9 (Pallan); JX-1052 at 1 (November 2020 email from Pallan to Seruma stating the parties needed to "[f]inalize KN subscription agreements to convert the $10 million [bridge loan from Kuramo to KN Agri] to equity" in Series B, and Seruma saying nothing); Trial Tr. at 251:10–252:11(Pallan); JX-1070 at 1 (Seruma and Kuramo diagramming the post-transaction ownership structure to show that Kuramo was the 99% owner of KN Agri, and NGFF was the 1% owner); Trial Tr. at 252:12–254:10 (Pallan).

[246] JX-1133 at 1.

[247] Trial Tr. at 842:11–843:23 (Seruma).

In support, the Nile Parties point to a $4 million drawdown request from December 2020.[248] But, as Seruma acknowledged, that $4 million drawdown request was a mistake.

The initial December 2020 request used the November 2020 request as a template and therefore accidently made a $4 million ask instead of a $250,000 ask.[249] Pallan noticed the mistake and informed Seruma.[250] And Seruma made that change, titling the email's subject line "Oops" and stating that the December 2020 drawdown notice "is corrected now" to $250,000.[251]

### E.    The End

In the end, Seruma did not gain control of the PHC Shares for an independent reason—the DFI Lenders did not want to work with him. At the time of the falling out, the DFI Lenders still had business with the Consortium. The final step of the Restructuring Transaction involved the DFI Lenders writing off up to 80% of their PHC debt.[252] To do so, Feronia KNM needed to complete a "know your customer" ("KYC") process.[253]

---

[248] Nile Post-Trial Opening Br. at 65.

[249] *See* JX-1159 at 2.

[250] JX-1158 at 1.

[251] JX-1160 at 1.

[252] Support Agr. at 14.

[253] Trial Tr. at 310:1–19 (Pallan); *see* JX-1048 at 1; JX-1318 at 3.

After the February 10 board meeting, Kuramo informed the DFI Lenders it had "decided to part ways with Larry Seruma."[254] The DFI Lenders responded that they were "[n]ot surprised or disappointed, but appalled" by the development.[255] The DFI Lenders did not take sides between Kuramo and Seruma and instead told both parties they would hear them both out.[256]

During the first two weeks of March 2021, the DFI Lenders held calls with both Kuramo and Seruma to try to understand each party's point of view and how the transaction could be completed.[257] After the calls, the DFI Lenders asked Seruma a series of questions, including basic questions about NGFF and KN Agri. Seruma provided incomplete responses.[258] That led to the DFI Lenders explaining that Seruma produced "documents showing three completely different current ownership structures in KN Agri. All certified or documented by IQEQ or confirmed by DLA Piper. That's not acceptable."[259] The DFI Lenders explained that, without this

---

[254] JX-1267 at 1–2. Adeosun further sent the DFI Lenders an email on February 15, 2021, accusing Seruma of acting against Kuramo. JX-1343 at 1, 3–4. Three days later, Adeosun formed a committee with the goal of taking back control of PHC. JX-3041; Trial Tr. at 645:11–20 (Adeosun).

[255] JX-1267 at 1.

[256] *See* JX-1349 at 1; JX-1421 at 1; JX-1439 at 1.

[257] JX-1421 at 1; JX-1439 at 1.

[258] JX-1440 at 1; JX-1456 at 1; JX-1457 at 1; JX-1461 at 1–2, JX-1465 at 1; JX-1466 at 1; JX-1467 at 1–2; JX-1471 at 1–3; JX-1747 at 1–3.

[259] JX-1479 at 1.

information, they would not "be able to declare the restructuring agreements effective."[260]

Among the questions the DFI Lenders needed answers to was: What is Mpala?[261] Seruma responded to the DFI Lenders' questions later that day, but he did not answer them. Rather, he stated that "the complexity is real!" and that he would clear up any confusion on the phone.[262] The DFI Lenders were not satisfied by this response. They said: "This must not be confusing and complex . . . . Who are you and why are you now the key man and the person who apparently controls every company in the PHC world and take every major decision for PHC?"[263] Seruma reacted with a defensive and hostile tone.[264] And the DFI Lenders ultimately concluded that they could not sign off on the KYC process with Seruma at the helm.[265]

---

[260] *Id.* ("If we don't get a satisfaction of our KYC check, we won't be able to declare the restructuring agreements effective.").

[261] *Id.* ("Please clearly explain what Mpala Limited is. The information you sent (the investment teaser/the 'valuation' by Cohen & Co) do not match. A 4,000 ha farm in an early development stage does not have a value of 22 MM USD. We would be grateful if you could provide an independent valuation for your investment into KN Agri and explain once again why and how this was assigned by L & E Seruma from KN Agri to NGFF. That's a complete riddle to me and it would be very keen to understand it.").

[262] JX-1482 at 1.

[263] *Id.* (bold omitted).

[264] JX-1488 ("I must say that I am quite surprised by the tone of your March 24 emails.").

[265] JX-1502 at 1 ("But here my blunt early warning: The currently frozen restructuring deal we worked out in 2020, will not get effective with you, Larry Seruma, as key man and UBO in the deal. You would need to immediately seek a new solution for the senior lender's debt of 45 MM USD. The explanation for this stance is that the senior lenders idea was to make a deal with Kuramo. This was approved

49

In April 2021, the DFI Lenders offered to continue the transaction with Kuramo at the helm and offered Kuramo the opportunity to acquire the PHC debt, which Kuramo accepted.[266]

In March 2021, the DFI Lenders forwarded to Kuramo information that Seruma had shared with them during the KYC process.[267] That information revealed the Mpala Relocation, among other things.[268]

### F.    This Litigation

Kuramo filed suit on April 15, 2021, claiming that Seruma, NGFF, and KN Agri breached their contracts with Kuramo, and that Seruma breached his fiduciary duties to Kuramo.[269] On July 22, 2021, Kuramo filed an amended complaint adding other Kuramo entities as plaintiffs, adding Nile as a co-defendant, and adding claims for declaratory judgment, fraud, fraudulent concealment, and unjust enrichment.[270]

Nile answered the amended complaint, asserted counterclaims, and added two additional Kuramo entities as third-party defendants. Nile asserted claims for breach of contract, tortious interference with business relations, unfair competition,

---

in our committees. A total change of the partner we deal with, makes our internal approvals void. Looking at the history of the last 3 months, I'm terribly sorry, but I can't see that you will meet our (at least DEG's) KYC and compliance requirements. My apologies if you feel offended by this strong statement, but that's the reality." (bold omitted)).

[266] JX-1518 at 3; Trial Tr. at 666:8–14 (Adeosun); JX-1522 at 1–2; JX-1669 at 1–3.

[267] Trial Tr. at 313:14–316:14 (Pallan); JX-1458 at 1–2; JX-1459 at 1–3.

[268] Trial Tr. at 313:14–316:14 (Pallan); JX-1458 at 1–2; JX-1459 at 1–3.

[269] Dkt. 1.

[270] Dkt. 9 ("Am. Compl.").

declaratory judgment, defamation, violation of Delaware's Deceptive Trade Practices Act, estoppel, and conversion.[271]

Nile later amended its counterclaims and third-party complaint to add Feronia KNM SRL as a counter-plaintiff and third-party plaintiff, to add Adeosun and Pallan as third-party defendants, and to remove the unfair competition, defamation, Delaware Deceptive Trade Practices Act, and conversion claims.[272] Adeosun and Pallan were later removed as third-party defendants.[273] Kuramo answered the amended counterclaims and third-party complaint.[274]

The court held a five-day trial commencing on May 1, 2023.[275] The parties filed post-trial briefing,[276] and the Court held post-trial oral argument on October 6, 2023.[277]

## II. LEGAL ANALYSIS

By the time of trial, the parties seemed to have winnowed down their claims, counterclaims, and third-party claims, but not in a way that made the court's job easier. The parties' submissions were extensive. There were many dangling issues,

---

[271] Dkt. 17.

[272] Dkt. 42.

[273] Dkt. 106.

[274] Dkt. 247.

[275] Dkt. 273.

[276] Dkt. 290 ("Kuramo Post-Trial Opening Br."); Dkt. 291 ("Nile Post-Trial Opening Br."); Dkt. 295 ("Kuramo Post-Trial Answering Br."); Dkt. 296 ("Nile Post-Trial Answering Br.").

[277] Dkt. 300. The parties submitted the Joint Schedule of Evidence on August 25, 2023. Dkt. 298.

as well as underdeveloped, abandoned, and late-raised arguments. This legal analysis represents the court's best effort to make sense of it all.

### A. Kuramo's Claims Against Seruma

Kuramo's primary claim is that Seruma breached his fiduciary duties by misappropriating Kuramo's beneficial interest in PHC through the Restructuring Transaction. In addition, Kuramo claims that Seruma committed fraud by falsely representing that he was protecting Kuramo's interests. Kuramo also claims that Seruma, Nile, and KN Agri breached their obligations under the Amended Nile LLC Agreement and the 2020 Bridge Loan Agreement, respectively, and seeks a declaration that Seruma is not entitled to advancement or indemnification. Kuramo also asserted but failed to press claims for fraudulent concealment and breach of the Amended KN Agri LLC Agreement and NGFF LLC Agreement. Kuramo has waived those claims.[278]

### 1. Breach Of Fiduciary Duties

Kuramo frames its claim for breach of fiduciary duties as a claim for "misappropriation," focusing on the end result as opposed to the discrete actions that Seruma took to reach that result (the Mpala Relocation, NewCo Maneuver, and 1% to Majority Move, collectively, the "Challenged Transactions").[279] Kuramo argues

---

[278] *Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial.").

[279] *See* Factual Background § D.

that the Challenged Transactions are subject to review under the entire fairness standard, and that the Nile Parties cannot prove that the actions were entirely fair.

Although both sides treat Kuramo as an umbrella fund run by Adeosun and Pallan, in post-trial briefing, Seruma argues that Kuramo's claim for breach of fiduciary duty fails because "Kuramo fails to specify which of the Kuramo Parties Seruma supposedly owed a fiduciary duty as the Managing Member of Nile Capital Management."[280] The Nile Parties did not adequately develop this issue. All briefs were imprecise when distinguishing the entities from their principals. In all scenarios, Seruma was the human at the helm of the conduct underlying the claims of fiduciary breach. The court thus focuses on the arguments against him.[281]

Strangely, both sides briefed this claim under common law fiduciary standards, although it is an alternative entity dispute.[282] Kuramo argues that default

---

[280] Nile Post-Trial Answering Br. at 74.

[281] Counts I–V (for breach of fiduciary duty, declaratory judgment, unjust enrichment, and fraud) are asserted against "Seruma and each of the Seruma controlled parties." Am. Compl. ¶¶ 101–26. Count VI (for breach of the Amended Nile LLC Agreement) is asserted against Seruma and Nile Capital. *Id.* ¶¶ 127–31. Counts VII and VIII (for breach of the NGFF LLC Agreement and the KN Agri LLC Agreement) do not specifically identify against which defendants the claims are asserted. *Id.* ¶¶ 132–41. Count IX (for breach of the 2020 Bridge Loan Agreement) is asserted against KN Agri. *Id.* ¶¶ 142–46. Count X (breach of fiduciary duty related to Mpala) is asserted against Seruma and NGFF. *Id.* ¶¶ 147–51. And Count XI (for declaratory judgment) is asserted against Seruma, KN Agri, and NGFF. *Id.* ¶¶ 152–56. In Kuramo's post-trial answering brief, Kuramo focuses its arguments on Seruma. *See* Kuramo Post-Trial Opening Br. at 109 ("Seruma breached his fiduciary duties"). The court follows this approach for the purpose of the fiduciary duty claims.

[282] Under Delaware law, managers or managing members of LLCs owe the full panoply of fiduciary obligations unless the LLC agreement eliminates or modifies them. 6 *Del. C.* § 18-1101. A provision that eliminates or modifies default obligations

fiduciary duties apply, and aside from a passing reference to the contractual standards,[283] Seruma defends his conduct under default fiduciary obligations. The court follows the parties' lead.

---

"must be clear and unambiguous." *Manti Hldgs, LLC v. Carlyle Gp. Inc.*, 2022 WL 444272, at *2 (Del. Ch. Feb. 14, 2022) (citations omitted). Any ambiguity is interpreted "in favor of preserving fiduciary duties." *Id.* (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009)). "[T]he standards for proving waiver under Delaware law are 'quite exacting,'" and "[t]he facts relied upon to prove waiver must be unequivocal." *Id.* (alteration in original) (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021)).

[283] The Nile Parties half-heartedly argue that the governing LLC agreements either eliminated or modified (they do not specify which) default fiduciary obligations. *See* Nile Post-Trial Opening Br. at 135. But the Nile Parties have not developed these arguments. *See id.* (arguing that because the Nile Parties prevail "under the default standards, there is no need to fully brief whether they satisfied their contractually-modified duties"). The Nile Parties "reserve[d] the right to fully brief this issue." *Id.* But they failed to brief it in their Post-Trial Answering Brief. Nile Post-Trial Answering Br. at 74–75 (devoting two paragraphs to the issue in a 92-page answering brief). It is not the court's job to tease out arguments for a party, particularly when they are well represented. So, this decision jumps to the common law analysis.

Moreover, the analysis would be the same under the contractual standard. Section 13.3 of the Amended Nile LLC Agreement provides that the manager is required to resolve a conflict "in a manner that is, or provides terms that are, fair and reasonable to the Company or any Member . . . ." Am. Nile LLC Agr. § 13.3(b). The phrase appears similar to the language used in *Energy Transfer Equity, L.P. Unitholder Litigation*, which the high court interpreted as invoking a standard similar to entire fairness review. 2018 WL 2254706, at *18 (Del. Ch. May 17, 2018) (alteration in original), *aff'd sub. nom.*, *Levine v. Energy Transfer L.P.*, 223 A.3d 97 (Del. 2019) (TABLE); *see also Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 256–57 (Del. 2017) ("[t]he fair and reasonable standard is something, if not equivalent to, entire fairness review" (internal quotation marks and citation omitted)).

Additionally, although the Amended KN Agri LLC Agreement and the NGFF LLC Agreement both contain exculpation provisions, neither protect Seruma here. Specifically, Section 2.7 of the Amended KN Agri LLC Agreement provides that the manager is not liable if he acts "in the best interest of the Company or Series . . . ." Am. KN Agri LLC Agr. § 2.7. And Section 5.5.1 of the NGFF LLC Agreement provides that the manager is not liable for actions taken "in good faith on behalf of the

54

When determining whether fiduciaries have breached their default duties, a court applying Delaware law evaluates the fiduciaries' conduct through a standard of review.[284]  Delaware law has three levels of standards of review: business judgment, enhanced scrutiny, and entire fairness.[285]

The court evaluates a transaction under the most onerous standard, the entire fairness standard, "[w]hen a transaction involving self-dealing by a controlling shareholder is challenged."[286]  "When the governing standard of review is entire fairness, either because the plaintiff has made the necessary showing to rebut the business judgment rule or for other reasons, then the defendant fiduciaries bear the burden of proof to show that they in fact acted in a manner that was entirely fair to their beneficiaries."[287]

Kuramo argues that entire fairness applies to the Challenged Transactions because Seruma controlled the Challenged Transactions[288] and those transactions

---

Company and in a manner reasonably believed by them to be within the scope of the authority granted to them . . . except when such action or failure to act constitutes gross negligence, fraud or willful misconduct."  JX-1448 at 208.  Seruma did not act in the best interest of the Company or take actions in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of his authority.

[284] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

[285] *Chen*, 87 A.3d at 666 (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

[286] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012) (citations omitted).

[287] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018) (citation omitted).

[288] *See* Kuramo Post-Trial Opening Br. at 109 ("It is undisputed that Seruma owed Kuramo fiduciary duties stemming from, among other things, Seruma's role as the

served to convey to Seruma and his wife a majority beneficial ownership interest in the principal investment that he was managing.[289] This is a conflict. Indeed, it is a pretty egregious one.

In response, Seruma argues that the business judgment rule applies. He does not attack Kuramo's premise that Seruma is a controller. Rather, he argues that there was no conflict. To set up this argument, he describes the Challenged Transactions narrowly as the sale of the Consortium's Feronia stake and the Canadian bankruptcy process.[290] He says that this was an arm's-length transaction because "no Nile Fund Party was on both sides of the Asset Sale,"[291] and "[t]he Asset Sale was approved by Feronia Inc.'s independent directors with the advice of counsel, implemented by an independent Proposal Trustee, and approved by a Canadian Bankruptcy Court."[292]

---

*sole human controller of the Delaware LLCs NGFF and KN Agri*, in both of which Kuramo is a non-managing member, and from Seruma's status as an investment advisor who long managed Kuramo investment funds" (emphasis added) (citing *See Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011), with an explanatory parenetical that the "human controller of investment firm organized as Delaware alternative entity owes fiduciary duties to fund's majority, outside investor")).

[289] Kuramo also cites to case law where entire fairness was applied to a conflicted controller transaction. *See, e.g.*, nn. 589–90 (citing *Levco Alt. Fund Ltd. v. Reader's Digest Ass'n, Inc.*, 803 A.2d 428, 2002 WL 1859064, *2 (Del. Aug. 13, 2002) (TABLE); *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, *12 (Del. Ch. Jan. 25, 2016); *Reis*, 28 A.3d at 459).

[290] Nile Post-Trial Answering Br. at 77–78.

[291] *Id.* at 77.

[292] *Id.* at 77–78.

Seruma's argument unduly limits the scope of Kuramo's challenge to a single action. And the argument does not work as to that action because none of the approvals nor implementing mechanisms on which he relies dealt with Seruma's actions *vis-á-vis* Kuramo. Rather, their roles and purpose were to ensure the integrity of the process *vis-á-vis* the debtor and its creditors. In the course of these Challenged Transactions, Seruma owed fiduciary obligations to Kuramo.

Accordingly, the court evaluates the Challenged Transactions under the entire fairness standard. The Delaware Supreme Court has described entire fairness review as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[293]

Entire fairness review calls upon the court to "carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness."[294] "Given the

---

[293] *In re Tesla Motors, Inc., S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) [hereinafter "*SolarCity III*"] (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).

[294] *Id.* (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1179 (Del. 1995)).

unitary nature of the test, findings in one area may seep into the findings of the other. As a result, 'a fair process usually results in a fair price.' The opposite is also true: 'an unfair process can infect the price.'"[295]

The Nile Parties bear the burden of proving the fairness of the Challenged Transactions.[296] The Nile Parties failed to prove that the Challenged Transactions were the product of fair dealing or at a fair price.

### a. Fair Dealing

"The element of 'fair dealing' focuses upon the conduct of the . . . fiduciaries in effectuating the transaction."[297] When discussing fair process in *SolarCity III*, the Delaware Supreme Court encouraged this court to focus on what it refers to as the "*Weinberger* factors."[298] Those factors are "how the deal was initiated and timed, how it was structured and negotiated, and how it was approved."[299] Those factors "form the core of a court's fair dealing analysis."[300]

The first *Weinberger* factor "examines how the decision under challenge was initiated."[301] The goal of the analysis is to determine whether the fiduciary timed the

---

[295] *Id.* at 702 (alterations in original) (first quoting *Ams. Mining*, 51 A.3d at 1244, then quoting *Trados*, 73 A.3d at 78).

[296] *Id.* at 700–01.

[297] *Id.* at 701 (quoting *Kahn v. Tremont*, 694 A.2d 422, 430 (Del. 1997)).

[298] *Id.* at 702.

[299] *Id.* (citing *Weinberger*, 457 A.2d at 711).

[300] *Id.*

[301] *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *36 (Del. Ch. May 4, 2020).

proposal opportunistically in some way.[302]  Seruma timed his transfer of Mpala to occur before the Restructuring Transaction, which allowed him to claim that the parties envisioned a 60/40 split in KN Agri between NGFF and Kuramo after the Restructuring Transaction—a split where NGFF either was Seruma's entirely, or where he beneficially owned a majority interest.

The next *Weinberger* factor examines how the transaction was negotiated and structured.  Here, there was no negotiation concerning the events that ultimately led Seruma to claim a 60/40 split.  Seruma claims that Kuramo agreed to him moving Mpala and to the 60/40 split, but there is no evidence of that fact.  The evidence is directly to the contrary.  In fact, Kuramo and Seruma had specifically negotiated for Mpala to be ring-fenced from Kuramo's assets because Kuramo did not want its investment diluted from an in-kind contribution, the value of which Kuramo did not trust.  Instead of abiding by that negotiated solution, Seruma ignored it and decided to contribute Mpala to NGFF.

The last *Weinberger* factor examines how the transaction was structured and approved.  "Whether a transaction was structured to include procedural protections—such as requiring the approval of an independent board negotiating committee or a majority of the minority vote—is another important indicium of fairness."[303]

---

[302] *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *18 (Del. Ch. Aug. 19, 2022) ("The . . . initiation of a transaction can evidence a lack of fair dealing where it favors the controller to the minority's detriment." (citation omitted)), *aff'd*, 303 A.3d 337 (Del. 2023) (TABLE).

[303] *Id.* at *19 (collecting cases).

Here, there was no independent structure or approval process. To the contrary, Seruma executed the Challenged Transactions unilaterally and told Kuramo that he had or was taking certain actions, while doing just the opposite. For example, Seruma moved his Mpala asset to NGFF even though he had negotiated with Kuramo that his personal asset would stay in KN Agri Series C to avoid being co-mingled with Kuramo's assets.

Seruma argues that the Challenged Transactions were "approved by Feronia Inc.'s independent directors with the advice of counsel, implemented by an independent Proposal Trustee, and approved by a Canadian Bankruptcy Court."[304] But again, that approval concerned the integrity of the process *vis-á-vis* the debtor and its creditors. Neither Kuramo, nor any person or body acting on Kuramo's behalf, approved the Challenged Transactions.

### b. Fair Price

"In the fair price analysis, the court looks at the economic and financial considerations of the transaction to determine if it was substantively fair."[305] "Fair price and fair value standards call for equivalent economic inquiries."[306] "The fair price aspect of the entire fairness test, however, is not in itself a remedial calculation."[307] "Instead of picking a single number, the court's task is 'to determine

---

[304] Nile Post-Trial Answering Br. at 77–78.

[305] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *13 (Del. Ch. Mar. 21, 2018) (citation omitted).

[306] *Tornetta v. Musk*, 310 A.3d 430, 533 (Del. Ch. 2024) (citation omitted).

[307] *Id.* (citation and internal quotation marks omitted).

whether the transaction price falls within a range of fairness."[308]  The fair price aspect of the entire fairness standard involves consideration of "all relevant factors" and may encompass "proof of value by any techniques or methods which are generally considered acceptable in the financial community."[309]

"[P]rocess can infect price."[310] And "where the pricing terms of a transaction that is the product of an unfair process cannot be justified by reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult."[311]

To demonstrate fair price, Seruma argues that "[t]he value of Mpala has been independently appraised and independently audited multiple times by multiple parties."[312] This approach is slightly misguided, because the parties expressly agreed that Kuramo would not be diluted by Mpala.

---

[308] *In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185, at *39 [hereinafter "*SolarCity II*"] (quoting *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015)), *aff'd*, 298 A.3d 667 (Del. 2023).

[309] *Weinberger*, 457 A.2d at 713; *accord SolarCity II*, 2022 WL 1237185, at *32.

[310] *SolarCity III*, 298 A.3d at 733 (quoting *Reis*, 28 A.3d at 467).

[311] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 748–49 (Del. Ch. 2007); *see also In re Loral Space and Comm'ns Inc.*, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008) ("When the process used involves no market check and the resulting transaction is a highly unusual one impossible to compare with confidence to other arms-length transactions, the court is left with no reasoned basis to conclude that the outcome was fair.").

[312] Nile Post-Trial Opening Br. at 34.  Seruma adds that the Canadian Bankruptcy Court "already adjudicated that the price was fair."  Nile Post-Trial Answering Br. at 79.  But the Canadian Bankruptcy Court was not making any determination as to Mpala.

This approach does not work for another reason—Seruma failed to prove the value of Mpala. Seruma points to (i) the Barfric valuation,[313] (ii) the MAMM audit report,[314] (iii) the Cohen & Co. audit statement,[315] and (iv) the BDO valuation.[316]

And each of these pieces of evidence proved unreliable for the reasons stated above.[317]

Accordingly, even if the value of Mpala could demonstrate fair price, the Nile Parties failed to prove that Mpala was worth approximately $20 million.

For these reasons, the Nile Parties failed to prove the fairness of the Challenged Transactions. Kuramo is entitled to judgment in its favor.

## 2. Fraud

Kuramo repackages its claim for breach of fiduciary duty as a claim for fraud, but this legal theory seems largely duplicative of Kuramo's claims for breach of fiduciary duty. Because Kuramo prevailed on its claims for breach of fiduciary duty, the court need not reach the fraud claim.

---

[313] JX-1681 at 2 (Barfric Valuation Report).

[314] JX-275 at 29–31 (MAMM Audit Report).

[315] JX-273 at 3 (Cohen Valuation Memo).

[316] JX-1679 at 18, 31 (July 2021 Mpala Limited Equity Valuation Report).

[317] *See* Factual Background § D.1. Kuramo and the DFI Lenders both did not believe that Mpala was worth $20.2 million. *See* Trial Tr. at 149:19–151:24 (Pallan) (stating Seruma provided Kuramo with no relevant information supporting his valuation for Mpala despite Kuramo's repeated asks); JX-1479 at 1 ("The information you sent (the investment teaser/the 'valuation' by Cohen & Co) do not match. A 4,000 ha farm in an early development stage does not have a value of 22 MM USD. We would be grateful if you could provide an independent valuation for your investment in KN Agri and explain once again why and how this was assigned by L & E Seruma from KN Agri to NGFF.").

### 3.     Breach Of Contract

A party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence.[318]   Under Delaware law, the elements of a breach of contract claim are: a contractual obligation; a breach of that obligation; and a resulting damage.[319]

The court's task is to interpret the contract in a way that effectuates the parties' intent.[320]   Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[321]   The contract terms will be given "plain, ordinary meaning."[322]   "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such

---

[318] *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *19 n.214 (Del. Ch. Aug. 10, 2020); *Braga Invs. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *8 (Del. Ch. June 8, 2020); *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *36 (Del. Ch. Mar. 30, 2017); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013); 23 *Williston on Contracts* § 63:14 (4th ed. May 2023 update).

[319] *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010) (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).

[320] *E.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[321] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[322] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

inference runs counter to the agreement's overall scheme or plan."[323]  The court must "reconcile all the provisions of the instrument" if possible.[324]

### a.    The Amended Nile LLC Agreement

Kuramo claims that Seruma and Nile breached the implied covenant of good faith and fair dealing of the Amended Nile LLC Agreement "through their participation in the wrongful scheme" detailed in the amended complaint.[325]  In its post-trial briefing, Kuramo noted that this claim was subordinate to its claim for breach of fiduciary duty.[326]  Because Kuramo prevailed on its claims for breach of fiduciary duty, the court need not reach this claim.

### b.    The 2020 Bridge Loan Agreement

Kuramo claims that KN Agri breached the 2020 Bridge Loan Agreement, which required KN Agri to repay any outstanding loan within five business days of Kuramo's demand.[327]  KN Agri does not dispute that it failed to repay the loans, but instead asks the court not to enforce the contract due to Kuramo's conduct.  KN Agri advances two arguments.

---

[323] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted).

[324] *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) (citation omitted).

[325] Am. Compl. ¶¶ 127–31; *see* Kuramo Post-Trial Opening Br. at 124.

[326] Kuramo Post-Trial Answering Br. at 49.

[327] Am Compl. ¶¶ 142–46; Kuramo Opening Post-Trial Br. at 130–31; JX-803 §1.1 (defining *Maturity Date* to include the Demand Date, defined as five business days after repayment demand); *id.* §7.1 (requiring repayment on Maturity Date); JX-1265 at 3 (demand notice).

First, KN Agri argues that Kuramo should be estopped from enforcing the agreement because it promised to convert the loan to equity.[328] But promissory estoppel is inapplicable "where a fully integrated, enforceable contract governs the promise at issue."[329] The 2020 Bridge Loan Agreement granted Kuramo an unconditional right to demand repayment. That contract governs.

Second, KN Agri argues that the contract must be voided because Kuramo and Mafuta interfered with a transaction between KN Agri and a palm oil company, Palmco, that would have allowed KN Agri to repay the loan within three months.[330] Pallan did impede the deal, but credibly explained at trial that he viewed it as a bad deal, which Seruma negotiated at a time when he was not empowered to act on behalf of PHC or Feronia KNM.[331] This is not a basis to void the 2020 Bridge Loan Agreement.

Kuramo has proven that KN Agri breached the 2020 Bridge Loan Agreement.

---

[328] Nile Post-Trial Opening Br. at 128–33.

[329] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013).

[330] Nile Post-Trial Opening Br. at 128–33.

[331] Trial Tr. at 480:18–481:6 (Pallan) ("We thought it was a terrible idea to -- the company only had two clients at the time, was looking at a third, and we did not think it was a good strategic idea to lock up production for a year, especially in an industry that's so volatile. So we did not think it was a good idea strategically. Second, Mr. Seruma had no authority to bind the company with this contract. He was not director general. He was representing he was the director general. And that was part of this whole process for why he wanted to be director general so that this contract could be validated."); *see* JX-1410 at 1 ("Palmco is merely one example they are using to show you - as director - were doing more than you should have been doing, which they may technically be correct about.").

### 4. Declaratory Judgment

Seruma's fees have been advanced by NGFF.[332] To cause NGFF to claw those fees back, Kuramo seeks a declaration that Seruma is not entitled to indemnification in connection with this litigation under the NGFF LLC Agreement.[333]

The NGFF LLC Agreement provides that indemnification is available "only if the indemnified party or parties in good faith, acted or failed to act in a manner it reasonably believed to be in, or not opposed to, the best interest of" NGFF.[334] The provision further provides that: "No indemnification may be made and each indemnified party shall reimburse [NGFF] to the extent of any indemnification previously made in respect of any claim, issue or matter as to which the indemnified party shall have been adjudged to be liable for gross negligence, fraud, or willful misconduct in the performance of its duties to [NGFF] unless, and only to the extent that, the court in which such action or suit was brought determines that in view of all the circumstances of the case, despite the adjudication of liability the indemnified party is fairly and reasonably entitled to indemnity for those expenses which the court deems proper."[335]

This decision has found that Seruma breached his fiduciary duties through the Challenged Transactions. These findings and holdings show that Seruma lacked

---

[332] Dkt. 17 ¶ 153; Kuramo Post-Trial Opening Br. at 131 n.642.

[333] Am. Compl. ¶¶ 152–56.

[334] JX-1448 at 208–09.

[335] *Id.*

good faith when orchestrating the Challenged Transactions. "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the [entity]."[336] Here, Seruma acted to promote his personal benefit—to offload his personal asset at a value he selected, thereby claiming a majority stake in Kuramo's investment.

Because Seruma did not act in good faith, he is not entitled to indemnification from NGFF.[337]

## B. The Nile Parties' Claims Against Kuramo

The Nile Parties assert eleven counterclaims against Kuramo.[338] They fall into three general categories. First, the Nile Parties claim that Kuramo tortiously

---

[336] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (quoting trial court).

[337] Kuramo adds that the funds NGFF advanced to Seruma should be paid directly to Kuramo. Kuramo Post-Trial Opening Br. at 132. Kuramo argues that a direct payment is warranted because "Kuramo owns 95% of NGFF, and is withdrawing its investment." *Id.* In support, Kuramo points to *In re Oxbow Carbon LLC Unitholder Litigation* for the proposition that a "'two sided and zero sum' paradigm warrants looking through NGFF" but does not explain how the compensatory damages and attorney's fees issue in *Oxbow* relates to the facts here. *Id.* (quoting 2018 WL 3655257, *15 (Del. Ch. Aug. 1, 2018), *vacated on other grounds sub nom. Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019)). If a party that was advancing fees is not entitled to indemnification, then that party must reimburse the entity that advanced the fees. Kuramo's theory is that because it has supplied 95% of NGFF's funds, that means it is entitled to 95% of the reimbursement. But that ignores standard indemnification practice. Even if there was a good reason to depart from this standard practice, Kuramo has not provided a compelling argument here.

[338] The Nile Parties do not distinguish among the Kuramo entities when advancing their arguments. *See, e.g.*, Nile Post-Trial Opening Br. at 106–07 (arguing in reference to their claim for breach of the Amended KN Agri LLC Agreement that "the Kuramo Parties wrongfully exercised control over Feronia's KNM property" and then listing actions purportedly taken by "Kuramo Agri Vehicle (and the Kuramo Parties

interfered with its business relations and contracts, and relatedly committed civil

conspiracy. Second, they assert claims for breach of contract. Specifically, they claim

that Kuramo breached the KN Agri LLC Agreement, the NGFF LLC Agreement, the

Amended Nile LLC Agreement, and the Side Letter Agreement by prohibiting

Seruma from managing the entities in the way he saw fit. Third, they assert a claim

for promissory estoppel against Kuramo in connection with the 2020 Bridge Loan and

GenAfrica.

### 1. Tortious Interference And Civil Conspiracy

The Nile Parties claim that Kuramo tortiously interfered with their

contractual relations in five ways, all of which center on the February 2021 PHC

board meeting.[339]

To prevail on a claim of tortious interference with contractual relations, the

Nile Parties must prove five elements: "(1) a contract, (2) about which defendant

---

generally)"); *id.* at 109–10 (arguing in reference to their claim for breach of the NGFF
LLC Agreement that "Master Fund is a party" and that "[t]he Kuramo Parties have
wrongfully asserted control over [NGFF]" constituting breach). As a consequence,
the court's analysis is similarly imprecise.

[339] They argue that Kuramo wrongly interfered in their contractual relations by:
(1) threatening to withdraw its investment; (2) telling the PHC Chair that "Seruma
lacked authority to call a board meeting and that Kuramo Capital Management (not
KN Agri) was the controlling Feronia KNM stockholder"; (3) "calling an unauthorized
meeting of PHC's board and falsely claiming that KCN had made 'changes' to Feronia
KNM's leadership"; (4) telling PHC's lenders that Kuramo owned 99.9% of KN Agri;
and (5) demanding the withdrawal of its money in NGFF before the lock-up period.
*Id.* at 98–99.

68

knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[340]

"The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance."[341]  "[S]ome types of intentional interference with contractual relations are a legitimate part of doing business."[342]  So "[d]etermining when intentional interference becomes improper requires a 'complex normative judgment relating to justification' based on the facts of the case and 'an evaluation of many factors.'"[343]

Kuramo argues that the Nile Parties' claim for tortious interference fails because it is asserted against contractual parties.[344]  "[A] party to a contract cannot tortiously interfere with its own contractual relations."[345]  To the extent the Nile Parties advance their claim for tortious interference against contractual counterparties for conduct governed by the contracts, then it does fail.  But the Nile

---

[340] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (emphasis in original) (citation omitted).

[341] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019) (quoting *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994)).

[342] *Id.* (quoting *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014)).

[343] *Id.* (quoting *Shearin*, 652 A.2d at 589).

[344] Kuramo Post-Trial Answering Br. at 78–79.

[345] *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015) (citation omitted).

Parties do not state precisely against whom they assert each claim, which makes the scope of this legal argument unclear.

Kuramo also argues that the Nile Parties' claim for tortious interference fails because Kuramo's actions were justified. The court evaluates seven factors in determining whether a party's actions were justified: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."[346]

The Delaware Supreme Court in *WaveDivision Holdings, LLC v. Highland Capital Management, L.P.* concluded that "[j]ustification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the contract. Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference."[347] This is a factually intensive analysis.[348]

---

[346] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (quoting *Restatement (Second) of Torts* § 767 (1979)).

[347] *Id.* (emphasis in original) (citing *Hursey Porter & Assocs. v. Bounds*, 1994 WL 762670, at *13 (Del. Super. Dec. 2, 1994); *Restatement (Second) of Torts* § 767 cmt. d).

[348] *Bandera*, 2019 WL 4927053, at *26. *Bhole* describes the lack of justification as an element of a claim for tortious interference. 67 A.3d at 453. That suggests that the claimant bears the burden of proof. *WaveDivision* describes justification as a "defense." 49 A.3d at 1174. That suggests that the defendant bears the burden of proof. The parties did not brief this issue. This decision takes the practical approach of assuming that Kuramo bore the burden of proof, which Kuramo carried.

70

Kuramo's conduct in connection with the February 2021 PHC board meeting was justified. At the time of the February 2021 PHC board meeting, Kuramo had just discovered that its purported fiduciary was working against its interests. Kuramo's conduct was defensive—it sought to prohibit immediate damage from being done. Kuramo's motive was to protect its investment from a perceived threat. Kuramo took immediate steps to stop Seruma from running away with its investment. And the steps it took were those actions it reasonably believed were necessary to secure its investment. The Nile Parties' claim for tortious interference with its contractual relations therefore fails.

The Nile Parties also seem to advance the theory that Kuramo tortiously interfered with their prospective business relationships. On this point, they argue that "Feronia KNM would have been able to complete a series of restructuring agreements and negotiated [sic] with PHC's senior lenders" absent Kuramo's tortious interference.[349]

Tortious interference with prospective business relations requires the showing of four elements: "(1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages."[350] "The tort is unusual, in that its application, even if these elements are met, is circumscribed by consideration of competing rights. Thus,

---

[349] Nile Post-Trial Opening Br. at 102.

[350] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 608 (Del. Ch. 2010) (citation omitted).

the elements of the tort must be considered in light of a defendant's privilege to compete in a lawful manner."[351]

In evaluating whether a defendant can claim the privilege to compete, the court evaluates the defendant's conduct under *Restatement (Second) of Torts* § 768. Specifically, "[t]o excuse liability, § 768 of the Restatement requires that: (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other."[352]  In evaluating whether the defendant employed wrongful means, the court evaluates the defendant's conduct under the same rubric it employs for evaluating the justification element in a tortious interference with contractual relations claim.[353]

"The tort may implicate free speech rights as well; that is to say, a person may be permitted to air a grievance or state an opinion, which may have the effect of harming another's business relationship, but which does not amount to tortious interference."[354]

The Nile Parties' claim for tortious interference with prospective business relations fails for lack of proximate cause.  After Kuramo terminated the Amended

---

[351] *Preston Hollow Cap. LLC v. Nuveen LLC*, 2020 WL 1814756, at \*12 (Del. Ch. Apr. 9, 2020) (citations omitted).

[352] *Id.* at \*17 (quoting *Restatement (Second) of Torts* § 768).

[353] *Id.; see WaveDivision,* 49 A.3d at 1174 (citing *Restatement (Second) of Torts* § 767)).

[354] *Preston Hollow*, 2020 WL 1814756, at \*12 (citation omitted).

Nile LLC Agreement, the DFI Lenders attempted to salvage the deal. In that effort, the DFI Lenders reached out to Seruma and asked if he would be interested in continuing with the Restructuring Transaction. After Seruma was unable to answer a series of questions the DFI Lenders posed to him, Seruma became hostile to the DFI Lenders, and they determined that they could not work with Seruma. It was Seruma's non-responsiveness and hostility to the DFI Lenders that ended his prospective business relationship, not any action by Kuramo.[355] The Nile Parties' claim for tortious interference with prospective business relations thus fails.

Related to the claim for tortious interference, Seruma alleges that "[t]he Kuramo Parties, including KCM's CEO Adeosun and COO Pallan, have conspired among themselves and with non-party Mafuta by entering into an unlawful agreement to tortiously interfere with the Nile Parties' contracts, business relations, and business expectancies, and to defraud PHC's Board and lenders."[356]

"Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."[357] "Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed."[358] Here, the Nile

---

[355] *See* Factual Background § E.

[356] Am. Countercl. ¶¶ 112–17.

[357] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998)).

[358] *Id.* (citing *Transched Sys. Ltd. v. Versyss Transit Solutions, LLC*, 2008 WL 948307, at *4 (Del. Super. Apr. 2, 2008) ("To succeed on a claim of civil conspiracy Plaintiff must first have a valid underlying claim."); *Interim Health Care v. Fournier*, 1994 WL 89007, at *8 n. 18 (Del. Ch. Feb. 28, 1994)).

Parties' claim for civil conspiracy is predicated on their claim for tortious interference, which, as stated above, fails. The Nile Parties' civil conspiracy counterclaim thus fails for lack of a valid predicate.

### 2. Breach of Contract

The Nile Parties claim that Kuramo breached the Amended KN Agri LLC Agreement and the NGFF LLC Agreement by asserting *de facto* control over the PHC investment as a non-managing member. They claim that Kuramo breached the Side Letter Agreement by failing to defer to Seruma's instructions. And they claim that Kuramo breached non-disparagement, non-compete, and nomination provisions of the Amended Nile LLC Agreement in myriad ways.

A party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence.[359] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs."[360]

The court's task is to interpret the contract in a way that effectuates the parties' intent.[361] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement

---

[359] *Dermatology Assocs. of San Antonio*, 2020 WL 4581674, at *19 n.214; *Braga Invs. & Advisory, LLC*, 2020 WL 3042236, at *8; *Simon-Mills II, LLC*, 2017 WL 1191061, at *36; *Zimmerman*, 62 A.3d at 691; 23 *Williston on Contracts* § 63:14.

[360] *WaveDivision*, 2010 WL 3706624, at *13 (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d at 140).

[361] *E.g.*, *Lorillard Tobacco Co.*, 903 A.2d at 739).

as a whole and giving effect to all its provisions."[362] The contract terms will be given "plain, ordinary meaning."[363] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[364] The court must "reconcile all the provisions of the instrument" if possible.[365]

### a. Amended KN Agri LLC Agreement And NGFF LLC Agreement

Kuramo is a non-managing member under the Amended KN Agri LLC Agreement and the NGFF LLC Agreement. The Amended KN Agri LLC Agreement provides that non-managing members have "no authority or right to act on behalf of [KN Agri] or any Series in connection with any matter."[366] The NGFF LLC Agreement similarly states that "[n]o Member shall . . . be permitted to take part in the management or control of the business or affairs of the Company . . . ."[367] The NGFF LLC Agreement expressly forbids a non-managing member from "hav[ing] any voice in the management or operation of any Company property."[368]

---

[362] *Viking Pump*, 148 A.3d at 648 (quoting *Salamone*, 106 A.3d at 368).

[363] *Alta Berkeley VI C.V.*, 41 A.3d at 385 (citing *City Inv. Co. Liquid. Tr.*, 624 A.2d at 1198).

[364] *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113.

[365] *Elliott Assocs.*, 715 A.2d at 854.

[366] Am. KN Agri LLC Agr. § 2.1.

[367] JX-1448 at 209.

[368] *Id.* at 209–10.

The Nile Parties claim that Kuramo exceeded its non-managing member status, and breached the Amended KN Agri LLC Agreement and NGFF LLC Agreement, by "falsely claim[ing] to PHC's board that [Kuramo is a] 'shareholder[]' of Feronia KNM due to Kuramo Agri Vehicle's KN Agri Series B investment, and that [Kuramo] control[s] Feronia KNM."[369] The Nile Parties claim that "[t]he Kuramo Parties have wrongfully asserted control over [NGFF] property, including KN Agri and its wholly-owned subsidiary Feronia KNM, in breach of the Nile Global Fund Agreement."[370] In their answering brief, the Nile Parties argue that Kuramo breached these provisions by wrongfully "exercis[ing] *de facto* control over PHC."[371]

Kuramo responds to these claims by admitting that "Kuramo has been closely involved in managing the PHC investment over the past two years."[372] Indeed, they note that they were "*always* closely involved in the management of the PHC investment, and *always* with Seruma's knowledge, consent and participation."[373] The agreements under which the Nile Parties claim breach were in place for years prior to the parties' dispute. "During those years, Seruma never took the position that the parties' agreements barred Kuramo from playing its highly-active role (of which, of

[369] Nile Post-Trial Opening Br. at 106–07.

[370] *Id.* at 110.

[371] Nile Post-Trial Answering Br. at 64; *see id.* at 4 (citing Trial Tr. at 466:6–7 (Pallan)).

[372] Kuramo Post-Trial Answering Br. at 76. This admittedly runs somewhat contrary to Kuramo's argument that Seruma was the sole human controller. But it does not undermine that argument. Seruma can control the entities as to the bulk of the Challenged Transactions although Kuramo actively participated in discrete events.

[373] *Id.* (emphasis original).

course, Seruma was fully aware)."[374]   Kuramo argues that, to the extent the agreements at issue foreclose its involvement with PHC, they were modified by the parties' course of conduct.[375]

"[A] court may find that the parties modified their obligations orally, by conduct, or through waiver."[376]   This is so notwithstanding a contractual provision to the contrary.[377]   But in order to find that a contract was modified by conduct, despite a provision requiring written modifications, the plaintiff bears a "high evidentiary burden" to show with "specificity and directness" that the parties intended to modify the contract through their course of conduct.[378]

Kuramo has met that burden here.   Kuramo brought the Nile Parties into the PHC investment.[379]   As part of the investment that Kuramo sourced, Kuramo negotiated that the Consortium would have three board seats on Feronia's board—

---

[374] *Id.* at 77 (underline original).

[375] *Id.* at 77–78.

[376] *See XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 659 (Del. Ch. 2022), *aff'd in part, rev'd on other grounds*, 304 A.3d 896 (Del. 2023); *see also Cont. Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) ("[I]t is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." (citing *Pepsi–Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28 (Del. 1972))).

[377] *See XRI Inv. Hldgs.*, 283 A.3d at 659 (stating that waiver may apply notwithstanding a contractual provision "that states that no party can waive any rights under an agreement, a court may find that a right has been waived").

[378] *Cont. Ins. Co.*, 750 A.2d at 1230; *see Rexnord Indus., LLC v. RHI Hldgs., Inc.*, 2008 WL 4335871, at *8 (Del. Super. Sept. 17, 2008) (finding that the parties did not modify their contract through their course of conduct because they had previously reduced their modifications to writing).

[379] Factual Background § A.4.

77

one for Kuramo, one for Nile, and one for Mafuta.[380]  In relevant part, Seruma acceded to the Consortium members' involvement.[381]

As part of the Restructuring Transaction, Seruma asked the Consortium if he could be appointed executive chairman and run the transaction, which the Consortium agreed to.[382]  In the draft resolution appointing Seruma executive chairman, it stated that he would also be appointed CEO.[383]  Pallan informed Seruma and counsel that this is not what the *parties agreed to*, and Seruma made the necessary remedial changes.[384]

Following the Restructuring Transaction, Adeosun emailed Seruma the proposed Feronia KNM and PHC governance structure, which proposed Adeosun be appointed chair of Feronia KNM, Seruma be appointed executive vice chair of Feronia KNM, and Mpinga be appointed CEO of PHC.[385]  In Seruma's email response in opposition to Adeosun's governance proposal, Seruma acknowledged the active role Kuramo has played.  Specifically, Seruma responded back to Adeosun and stated: "I am the Fund Manager of KN/NGFF and Kuramo will no longer put investments in my Fund or have any management decision/input to the Fund or its investments.

---

[380] Am. KKM Shareholders' Agr. § 6.2.3.

[381] Factual Background § B.2; *see, e.g.*, JX-111 at 4 (Seruma: "This email outlines the KKM proposal for your review, comments or suggestions."); Trial Tr. at 51:5–55:24 (Pallan).

[382] Trial Tr. at 139:2–24 (Pallan).

[383] JX-501 at 4.

[384] JX-502 at 1; JX-503 at 1; JX-504 at 1; *see* JX-507 at 1.

[385] JX-1187 at 2.

Kuramo investments in my fund or involvement in my fund decisions have created significant harm to my track record, business and I will not accept any future involvement."[386] That is, Seruma acknowledged that Kuramo had been involved in KN Agri and NGFF management decisions.

Accordingly, Kuramo has proven that the parties intended, by their conduct, to modify the agreements to allow for Kuramo's involvement in Seruma's management decisions. Although Seruma ultimately took issue with Kuramo's level of involvement, for the years the parties worked amicably together, he consented to Kuramo's more-than-passive level of involvement.

The Nile Parties argue that the agreements were not modified through the parties' course of conduct because "the parties have previously amended the agreements in writing."[387] They do not explain the legal effect of this factual assertion given the evidence of the parties' course of conduct. They also have not proven the factual basis for the argument. Although they do not point to which agreements support their theory, the only written amendments in the record, the Amended KN Agri LLC Agreement and the Second Amended NGFF LLC Agreement, were only signed by Seruma.[388] So the Nile Parties' argument fails.

---

[386] JX-1196 at 1; *see* JX-985 at 12:17–20 (Seruma telling Pallan: "I have had a situation where my fund -- you know, you guys have been pretty much running my fund indirectly and, you know, it gets to a stage where you just kind of continue going on like that.").

[387] Nile Post-Trial Answering Br. at 52 n.239 ("The standard is even higher where, as here, the parties have previously amended the agreements in writing." (citation omitted)).

[388] JX-1274 at 38; JX-1448 at 259.

The Nile Parties have not proven that Kuramo breached the Amended KN Agri LLC Agreement or the NGFF LLC Agreement.

### b. Side Letter Agreement

The Nile Parties allege that Kuramo breached the Side Letter Agreement by "fail[ing] to defer to [NGFF]'s binding instructions with respect to KKM and KKM2."[389] The Nile Parties point to three instances when Kuramo supposedly ignored Seruma's instructions.

First, on February 9, 2021, Adeosun and Mpinga sent a letter to the chair of PHC as "the 99% beneficial owners of Feronia KNM, the entity owning the shares of Feronia Maia, and as the previous owners of the KKM controlling entity," to inform the chair that Seruma's proposed nomination "is an unauthorized action."[390] The Nile Parties argue that this letter breached the Side Letter Agreement because Seruma had decided to nominate himself as DG of PHC and "Kuramo II GP did not have the contractual right to override that decision."[391]

Second, on April 16, 2021, Straight KKM 2 Limited filed suit against Seruma, KN Agri, Feronia KNM SARL, the Nile Parties' law firm (DLA Piper), and others, claiming that the defendants breached the Support Agreement and Purchase Agreement, and that the defendants violated the Canadian Bankruptcy Court's

---

[389] Am. Countercl. ¶¶ 133–36; Nile Parties' Post-Trial Opening Br. at 114.

[390] JX-1249 at 3.

[391] Nile Post-Trial Opening Br. at 114–15.

vesting order by "not constituting Feronia KNM SARL as a wholly-owned affiliate of Straight KKM 2 Limited."[392]

Third, the Nile Parties argue that "Adeosun and Pallan have also claimed to represent KKM and KKM2 and have voted to create a 'special committee' of the KKM Board—all against [NGFF]'s express instructions."[393]

The Side Letter Agreement addresses voting. That is because the purpose of the agreement was to align Kuramo and Nile in actions in relation to the third member of the consortium, Mafuta.[394] In relevant part, the Side Letter Agreement states:

1) Kuramo and Nile shall agree unanimously *on all voting matters* relating to the business of KKM and KKM2

2) In cases, where such agreement is not reached, Nile's instructions shall take precedence and be binding on Kuramo[395]

Neither the first nor the second challenges address "voting matters." As alleged, there was no vote. The Side Letter Agreement, therefore, does not apply to the first or second challenged actions. The third challenge appears to deal with a voting matter, but not one that was developed factually. In briefing, the Nile Parties support the argument by referring back to the factual background.[396] Their factual

---

[392] JX-1517 at 1, 4.

[393] Nile Post-Trial Opening Br. at 115.

[394] *See* JX-53 at 1–2.

[395] Side Letter Agr. at 2 (emphasis added).

[396] Nile Post-Trial Opening Br. at 115 n.562 (citing "*Facts*, Sections H.3-H.4").

81

recitation, however, does not discuss the factual basis for the third challenge. It does not appear anywhere in briefing.

The Nile Parties have not proven Kuramo breached the Side Letter Agreement.

### c. Amended Nile LLC Agreement

The Nile Parties claim that Kuramo breached the non-disparagement provision of the Amended Nile LLC Agreement by stating, in or around February 2021, that Seruma engaged in illegal or unethical behavior.[397] They also claim that Kuramo breached the non-compete and nomination provisions of the Amended Nile LLC Agreement by appointing a non-Nile entity (Nabo Capital Limited) to manage a fund Seruma was contractually entitled to manage (GenAfrica), thereby prohibiting Seruma from the investment manager fees he was owed.[398]

As to the claim for breach of the non-disparagement clause, Kuramo advances two arguments. Kuramo first argues that it did not breach the non-disparagement clause because that clause "applies only 'during and after the termination' of the

---

[397] Am. Countercl. ¶¶ 129–32; Nile Post-Trial Opening Br. at 112 ("[(1)] misinformed PHC's Chairman that Seruma abused his position by taking 'unauthorized action,' despite knowing he had done no such thing; [(2)] misrepresented to PHC's board that Feronia KNM's stockholders had 'withdrawn [their] confidence' in Seruma, when Adeosun could not speak on behalf of these stockholders; and [(3)] accused Seruma of 'appalling' acts of misconduct in his capacity as investment manager in a letter to PHC's investors and lenders, despite knowing this was a fabrication to get him deported.").

[398] Nile Post-Trial Opening Br. at 113 ("Kuramo Capital Management repeatedly breached both of the exclusivity and non-compete provisions, including by (i) failing to make Nile Capital the manager of Fund III's GenAfrica investment, (ii) naming a different manager (Nabo Capital Limited) to manage GenAfrica in Nile Capital Management's rightful place, and (iii) managing GenAfrica themselves.").

Agreement."[399]  Kuramo sent the notice of termination on February 10, 2021.[400]  The allegedly disparaging statements occurred on February 9 and 15, 2021.[401]  It appears that at least some of the allegedly defamatory statements, however, were made before Kuramo sent the termination notice.  Thus, even if effective, this argument is limited in scope.

Kuramo next argues that the Nile Parties' claim fails because they do not identify any harm or damages resulting from Kuramo's disparaging statements.[402] The Nile Parties claim that "the Kuramo Parties caused significant reputational damage to the Nile Fund Parties by violating non-disparagement agreements."[403] They do not explain, or attempt to prove, any measure for these damages.  Tacitly acknowledging this weakness, the Nile Parties ask for injunctive relief.  But they fail to explain what form this would take.  They neither brief nor argue the elements of a

---

[399] Kuramo Post-Trial Answering Br. at 84–85 (quoting Am. Nile LLC Agr. § 13.8(c) ("No Principal will, and each Principal will cause his or her affiliates not to, make or cause to be made or condone the making of any statement, comment or other communication, written or otherwise, that disparages in any material respect the Company or any of its subsidiaries or affiliates or any of any [sic] of the products or services of the Company or any of its subsidiaries or affiliates during and after the termination date.")).

[400] JX-1270 at 2 ("This Letter is formal notice to Larry Seruma of the intention by Kuramo Capital Management, LLC to immediately terminate the LLC Agreement. Pursuant to the LLC Agreement, we require a full redemption of all our beneficially-owned assets invested in, among other entities, [NGFF], and KN AGRI LLC."); *see* Trial Tr. at 280:22–283:2 (Pallan).

[401] JX-1249 at 2; JX-1251 at 5; JX-1321 at 3.

[402] Kuramo Post-Trial Answering Br. at 84–85.

[403] Nile Post-Trial Opening Br. at 1.

permanent injunction.[404] They do not claim that any of the conduct is ongoing. It is hard to know what to do with this request.

The Nile Parties have failed to prove their claim for breach of the non-disparagement provision.

As to the claim for breach of the non-compete provision, Kuramo argues that the provision does not apply to GenAfrica. The relevant language is in Section 7.4 of the Amended Nile LLC Agreement, which provides:

> Kuramo Capital Management LLC, affiliates or its principals will not own or directly invest or own any business entity in competition with the activities or products of the Company. However, the Funds managed by Kuramo may invest in business entities in Africa that compete with the Company and the principals of Kuramo will have an indirect ownership of business that compete with the Company via such Fund ownership.[405]

The provision prohibits Kuramo from obtaining an ownership interest in "any business entity in competition with the activities or products of the Company." But

---

[404] *See id.* at 112 (failing to assert specific harm). The Nile Parties also assert that injunctive relief is warranted for the non-disparagement breach, but beyond using the term "injunctive relief" the Nile Parties do not explain how they come close to satisfying the elements for a permanent injunction. *See Preston Hollow*, 2020 WL 1814756, at *20 ("The elements for permanent injunctive relief are: (1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted." (quoting *Sierra Club v. DNREC*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006), *aff'd*, 919 A.2d 547 (Del. 2007)).

[405] Am. Nile LLC Agr. § 7.4.

the Nile Parties did not show that GenAfrica competed with Nile.[406]  Accordingly, they have not proven that Kuramo breached the non-compete provision.

Kuramo similarly argues that the nomination provision does not apply to GenAfrica.  Section 7.2(b) of the Amended Nile LLC Agreement prohibits Kuramo from appointing advisors, other than Nile, to make investment decisions relating to the management of public market funds.  It requires that Kuramo:

> Nominate the Company as the sole Sub-Advisor for the public markets allocation of all future Funds and separate accounts managed by Kuramo. The Company will be sole advisor, sub adviser or entity to be allocated all the investments, investment decisions relating [to] the management of public markets investment funds, to include but not limited to, equities and fix income, hedge funds, alternative funds, mutual funds, or any other investment product or strategy in the public markets for which Kuramo directly has any control, discretion and/or management control.[407]

The provision applies only to "investment decisions relating [to] the management of public markets investment funds." Seruma acknowledged GenAfrica was not a public markets investment.[408]  Because the Nile Parties did not prove that GenAfrica was a public markets investment, they have not proven that Kuramo breached the nomination provision.

The Nile Parties have not proven that Kuramo breached the Amended Nile LLC Agreement.

---

[406] *See* Nile Post-Trial Opening Br. at 113–14; Nile Post-Trial Answering Br. at 67–68.

[407] Am. Nile LLC Agr. § 7.2(b).

[408] JX-98 at 1.

### 3. Promissory Estoppel

The Nile Parties assert promissory estoppel concerning the 2020 Bridge Loan and GenAfrica.

"To state a claim for promissory estoppel, a plaintiff must prove by clear and convincing evidence that: '(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.'"[409] "Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue."[410]

#### a. The 2020 Bridge Loan Agreement

The Nile Parties allege that Kuramo breached its promise to fund the entire $15 million bridge loan as part of the May 22, 2020 Bridge Loan Agreement.[411] As stated previously, the 2020 Bridge Loan Agreement fully governs the parties' relationship. Accordingly, the promissory estoppel claim fails.

#### b. GenAfrica

The Nile Parties claim that Kuramo breached its promise to provide Seruma with management rights and dividends in exchange for Seruma's novation of his

---

[409] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020) (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013)).

[410] *SIGA Techs.*, 67 A.3d at 348.

[411] Am. Countercl. ¶¶ 161–65.

interest in GenAfrica.[412]  Specifically, the Nile Parties assert that Kuramo refused to pay dividends unless Seruma agreed to give up his management rights, contrary to oral promises.[413]

Again, the Nile Parties fail to support their claim with sufficient proof.  There is no evidence of an oral promise.

For support, the Nile Parties rely on Seruma's testimony, when he stated that: "our expectation were [sic] when we novate our ownership into that vehicle, we will be able to get an equity that's proportioned to how much we invested but also reflected our sweat equity in terms of getting this transaction to the end. And also our expectations were that we are going to be the manager of GenAfrica going forward."[414] The court, however, gives little weight to Seruma's testimony because of his conduct detailed above.  And his testimony is directly contradicted by Pallan,[415] who was a credible witness.

---

[412] *Id.* ¶¶ 166–69.

[413] *Id.*; Nile Post-Trial Opening Br. at 126 (asserting that "[a]fter [NGFF] (through Seruma) invested in GenAfrica in 2018 pursuant to a Share Purchase Agreement, Kuramo Capital Management made a promise: if [NGFF] novated its GenAfrica interests to Kuramo Kenyan Fund, it would receive proportionate interests in Kuramo Kenyan Fund in exchange (and receive its pro rata share of dividends) and be appointed manager of the investment (with the right to receive management fees)"); *id.* at 126–27 ("In reliance upon Kuramo Capital Management's promise, [NGFF] novated its GenAfrica interests to Kuramo Kenyan Fund.").

[414] Trial Tr. at 957:1–7 (Seruma).

[415] *Id.* at 333:19–22 (Pallan).  Kuramo's CIO Shaka Kariuki testified to that same effect. *Id.* at 1342:9–12 (Kariuki).

The only other evidence on which the Nile Parties rely are two exhibits that do not support their argument. The first exhibit is a chain of emails from September 2019 that show Kuramo distributed a portion of a dividend in a Kuramo fund (Kenya III) from GenAfrica to Nile.[416] The second exhibit is a chain of emails from October 2020 that show Kuramo told Seruma that GenAfrica had paid dividends to Kuramo's fund (Kenya III) in 2020, but that fund had not yet declared a dividend for 2019.[417] The chain continues with an email from Pallan to Seruma stating: "Please remember we are also awaiting your review and signature on the business plan and a couple resolutions for GenA that are long outstanding."[418] In post-trial briefing, Seruma argues that the resolutions were Kuramo trying to force him to sign away his management rights in exchange for dividends, but the email chain does not support that position. And neither Seruma, nor any witness, provided testimony concerning that email chain.

The Nile Parties' claims for promissory estoppel thus fail.[419]

---

[416] JX-201 at 2.

[417] JX-939 at 1.

[418] *Id.*

[419] The Nile Parties seek three declarations. First, the Nile Parties seek a declaration that pursuant to the Canadian bankruptcy court sale order, Feronia KNM directly or indirectly controls 76.17% of PHC's Class A shares. Second, the Nile Parties seek a declaration that Kuramo has "no right to exercise power and authority over the operations of KN Agri or any of its Series Funds, or perform any acts or undertakings on behalf of KN Agri or its Series Funds, and that KN Agri is controlled by its managing member, [NGFF]." Third, the Nile Parties seek a declaration that Kuramo cannot redeem its investments from NGFF before June 30, 2022. *See* Am. Countercl. ¶¶ 137–60. Kuramo does not respond to the Nile Parties' requests for declaratory

## C. Remedies

Kuramo has proven that Seruma breached his duty of loyalty, KN Agri breached the 2020 Bridge Loan Agreement, and Seruma is not entitled to indemnification. Kuramo has not proven its remaining claims. The Nile Parties have not proven any of their claims. Kuramo's arguments for relief focus on the success of its claim for breach of fiduciary duty, and this analysis follows suit.

"Once a fiduciary breach has been established, this court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate."[420] "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[421] "Damages must be 'logically and reasonably related to the harm or injury for which compensation is being awarded,'"[422] but "[a]s long as there is a basis for an estimate of damages, and the plaintiff has suffered harm, 'mathematical certainty is not required.'"[423] Any uncertainties in calculating damages must be "resolved against the wrongdoer."[424]

---

relief directly, but the claims appear to overlap with the claims for breach of contract and breach of fiduciary duty and thus fail for the same reasons.

[420] *Dole*, 2015 WL 5052214, at \*44 (cleaned up).

[421] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[422] *Dole*, 2015 WL 5052214, at \*44 (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006)).

[423] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011) (quoting *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)).

[424] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at \*12 (Del. Ch. Oct. 29, 1993) (citation omitted); *see also Dole*, 2015 WL 5052214, at \*46 (applying wrongdoer rule).

Kuramo asks the court to order rescission by declaring that Feronia KNM "is owned by KN Agri Series B, and that Seruma's personal Mpala interests remain in KN Agri Series C."[425] To Kuramo, this is the transaction the parties agreed to.[426] Kuramo asserts that any other remedy would be "virtually impossible," in part because there is no way to value Mpala given the current record.[427] Kuramo adds that the court should declare Kuramo's interest in NGFF redeemed, and should shift "attorneys' fees and management fees Seruma owes to NGFF."[428]

The Nile Parties respond that Kuramo waived its ability to seek rescission by not asserting it earlier,[429] and ordinarily the court would agree. Here, however, Seruma's breaches of fiduciary duty require a remedy. And although "[i]t is a well-established principle of equity that a plaintiff waives the right to rescission by excessive delay in seeking it," the underlying policy rationale is to discourage plaintiffs from sitting back and waiting to see whether the defendants increase the value of the disputed enterprise.[430] This court has found that where there is no improper conduct, no prejudice, and the delay is not unreasonable, then a plaintiff is

---

[425] Kuramo Post-Trial Opening Br. at 142.

[426] *Id.*

[427] *Id.* at 143.

[428] *Id.* at 144.

[429] Nile Post-Trial Answering Br. at 90 n.441.

[430] *Ryan v. Tad's Enter., Inc.*, 709 A.2d 682, 699 (Del. Ch. 1996) (citation omitted), *aff'd*, 693 A.2d 1082 (Del. 1997) (TABLE).

not barred from asserting rescission.[431]  Kuramo therefore did not waive its request for rescission.

The remedy of rescission "restore[s] the parties substantially to the position which they occupied before making the contract."[432]  "Rescission 'is not given for every serious mistake and it is neither given nor withheld automatically, but is awarded as a matter of judgment.'"[433]  The court has broad discretion to award recission where the facts and circumstances warrant.[434]  This court has awarded rescission as a remedy for breach of fiduciary duty, particularly in the context of self-dealing

---

[431] *In re Fuqua Indus., Inc.*, 2005 WL 1138744, at *7 (Del. Ch. May 6, 2005).

[432] *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984) (citing Henry Campbell Black, *On Rescission and Cancellation* § 616 (2nd ed.)); *accord Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) ("rescission results in abrogation or unmaking of an agreement, and attempts to return the parties to the status quo" (quoting *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982)); *Geronta Funding*, 284 A.3d at 61 ("'[E]quitable rescission offers a platform to provide additional equitable relief, such as cancellation of a valid instrument—the formal annulment or setting aside of an instrument or obligation.'" (quoting *Ravenswood*, 2018 WL 1410860, at *21)).

[433] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 174 (Del. 2002) (quoting *Gaffin v. Teledyne, Inc.*, 1990 WL 195914, at *16 (Del. Ch. Dec. 4, 1990), *aff'd in part and rev'd in part on other grounds*, 611 A.2d 467 (Del. 1992)).

[434] *Id.* at 164 (stating that whether to order rescission is within the discretion of the Court of Chancery); *see also Weinberger*, 457 A.2d at 714 ("[T]he Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate."); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages" (citations omitted)).

transactions.[435]  The Delaware Supreme Court referred to recission as "the preferable remedy" in *Vickers* for breach of fiduciary duty where one party has misled another.[436]

To be entitled to equitable rescission, a plaintiff must demonstrate that rescission is both "reasonable and appropriate" under the circumstances.[437]  This includes showing that it is possible for "all parties to the transaction [to] be restored to the *status quo ante, i.e.*, to the position they occupied before the challenged transaction."[438]

Kuramo has demonstrated that rescission is reasonable, appropriate, and practicable.  The transaction is relatively easy to "unscramble."[439]  Seruma moved Mpala through an accounting notation.  He can move it back just as easily.  The court thus restores the parties to the bargain Seruma told Kuramo he was executing— where Kuramo holds 97.16% of KN Agri Series B, and KN Agri Series B holds Feronia

---

[435] *See, e.g.*, *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 46 (Del. Ch. 2010) (ordering rescission of a rights plan as a remedy for breach of fiduciary duty); *Valeant*, 921 A.2d at 752 (ordering rescission of a compensation plan where the defendants "failed to show that the transaction was entirely fair" and it was "clear that he has no right to retain any of the $3 million bonus he received").

[436] *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981) (describing rescission as the "preferrable" remedy), *overruled in part by Weinberger*, 457 A.2d at 703–04 ("We therefore overrule [*Vickers*] to the extent that it purports to limit a stockholder's monetary relief to a specific damage formula.").

[437] *Lenois v. Lawal*, 2017 WL 5289611, at *20 (Del. Ch. Nov. 7, 2017).

[438] *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (emphasis in original) (quoting *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982); *In Re MAXXAM, Inc.*, 659 A.2d 760, 775 (Del. 1995)).

[439] *See In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *14 (Del. Ch. Jan. 5, 2010) (declining to order rescission because the transaction was "too complex to unscramble").

KNM, which holds the PHC asset. And that Mpala remains ring-fenced in KN Agri Series C.[440]

## III. CONCLUSION

Kuramo seeks other relief, but it is difficult to determine whether the requested relief was fairly pled. For example, Kuramo seeks a declaration that its "interest [is] redeemed."[441] Kuramo did not plead this request for relief in the complaint or the amended complaint. It first appeared in Kuramo's pre-trial brief.[442] And the Nile Parties did not advance much of a defense to this request, except to say (inaccurately) that the redemption value of Kuramo's interest is $0. It is difficult to know what to do with this.

Given this open issue, and the extensive scope of the issues raised and the parties' failure to join them in briefing, the parties are granted leave to submit letters identifying any arguments or claims that they believe were fairly raised but that this decision does not address. When doing so, the parties shall summarize the claim or

---

[440] Kuramo requests attorney's fees based on a version of the bad faith exception to the American rule, which entitles litigants to their attorney's fees incurred in securing a clearly defined and established right. Kuramo Post-Trial Opening Br. at 145; *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000) ("A subset of this 'bad faith' exception is that attorneys' fees may be awarded if it is shown that the defendant's conduct forced the plaintiff to file suit to secure a clearly defined and established right." (citation and internal quotation marks omitted)); *Abex Inc. v. Koll Real Estate Gp., Inc.*, 1994 WL 728827, at *20 (Del. Ch. Dec. 22, 1994) ("Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right, are evidence of bad faith." (citing *Judge v. City of Rehoboth Beach*, 1994 WL 198700, at *2 (Del. Ch. Apr. 29, 1994))). The court does not shift fees lightly. And the facts and circumstances of this case do not warrant it.

[441] Kuramo Post-Trial Opening Br. at 144.

[442] Dkt. 256 at 71.

93

argument, identify where it was first raised, and where in the briefs and pleadings it was developed. Each side shall have the opportunity to respond to the other's submission. The parties shall meet and confer on a schedule to bring this final round of submissions to a close.